ROBERT M. CLAYTON III, Judge
Joseph Bowens ("Defendant") appeals the judgment entered upon a jury verdict convicting him of one count of first-degree murder, one count of first-degree robbery, *90 and two counts of armed criminal action. We affirm.
I. BACKGROUND
Defendant was charged with the above crimes for his alleged involvement in the shooting death and robbery of Scott Knopfel ("Victim") that took place on January 15, 2015. The crimes occurred at the Drury Inn hotel located near Interstate 44 and Hampton Avenue in the City of St. Louis ("the Drury Inn" or "the hotel"). Defendant was represented by a public defender from shortly before he was arraigned until he retained private counsel approximately two weeks prior to trial. Defendant was tried by a jury from April 5-8, 2016, and he does not challenge the sufficiency of the evidence to support his convictions.
A. Evidence Presented during the State's Case and Relevant Procedural Posture
Viewed in the light most favorable to the verdict, the following evidence was presented by the State at Defendant's trial. In January 2015, Dasha Lindsey worked as a security guard at the Drury Inn. In the early morning of January 15, 2015, Lindsey was working the overnight shift and watching the parking lot of the hotel. Lindsey's fiancé, James Montgomery, was with her, and they both sat in their car in the parking lot. Around 3:00 a.m., Lindsey and Montgomery noticed a small black Hyundai drive around the parking lot and back up when it was not necessary. The driver of the car, who Lindsey and Montgomery later identified as Defendant, exited the car, and the person in the front passenger seat "hopped over the middle console" into the driver's seat.
Defendant was wearing Nike Air Jordan shoes, a black and red Chicago Bulls hat, and a black leather jacket. Defendant looked at Lindsey and Montgomery, opened the back door of the car and got in the back seat, and sat in the back seat for about a minute while he kept looking at Lindsey and Montgomery. Defendant then exited the car and walked into the hotel, out of the sight of Lindsey and Montgomery. At this point, Lindsey used her walkie-talkie to try to contact Victim, the night auditor at the hotel, to warn him someone was coming inside. When Victim did not respond, Lindsey used her cell phone to call the front desk. The phone rang four or five times before it was picked up. Lindsey then heard a "pop" sound, and a very short time later, Defendant exited the hotel in a manner Lindsey described as "walking normally."
Concerned for Victim, Lindsey had Montgomery drive their vehicle to the front of the hotel, and Lindsey went inside. Lindsey found Victim lying on the floor behind the counter, saw the cash register was open, and called 911.
After the police arrived at the scene, they found Victim had a visible gunshot wound to his face and was deceased. A medical examiner later determined Victim died from gunshot wounds to the neck, chest, and abdomen. In addition, a Drury Inn employee later determined ninety-seven dollars was missing from the hotel cash register.
The police collected one bullet and one shell casing at the hotel and downloaded video surveillance footage, which clearly showed the assailant's face and clothing. Detective Michael Herzberg of the St. Louis City Police Department distributed it to the media for dissemination to the public, hoping someone would recognize the person in the video, call the police, and identify him. Detective Herzberg also obtained video footage from a red light camera, which showed a small black sedan enter the hotel parking lot.
*91 After the hotel video surveillance footage was disseminated to the public, Detective Herzberg received phone calls from Tony Jones, who was the Chief of Police for Caruthersville, Missouri ("Chief Jones" or "Chief Tony Jones"), and Veneto Johnson, who was a resident of Caruthersville. Chief Jones and Johnson both identified Defendant as the man in the video. Johnson also provided a phone number for Defendant. Chief Jones testified at Defendant's trial, but Johnson did not testify. The information Johnson provided to police was solely adduced through the testimony of Detective Herzberg, and defense counsel did not object to the admission of testimony from Detective Herzberg regarding Johnson's identification of Defendant.
Officers with the St. Louis City Police Department obtained historical GPS data for the phone number Johnson associated with Defendant. The GPS data showed Defendant's phone was traveling in the City of St. Louis and stopped in the area near the hotel in the minutes prior to Victim's murder.
In the meantime, Officer Jason Morgan of the Poplar Bluff Police Department learned Defendant was wanted for the crimes at the Drury Inn. Two days after the murder and robbery took place, Officer Morgan conducted a traffic stop of a black, four-door Hyundai that Defendant's wife Connie Bowens ("Defendant's Wife" or "Wife") was driving. Officer Morgan told Defendant's Wife he was looking for Defendant, and she agreed to take the officer to his location. She then took Officer Morgan to an apartment located at 640 Lindsay Street in Poplar Bluff ("the apartment"), where the officer found Defendant standing outside. Defendant was subsequently placed under arrest. Defendant was wearing Nike Air Jordan shoes, the shoes were seized at the time of his arrest, and the shoes were admitted into evidence at trial without objection.
Thereafter, Wife consented to a search of the apartment and to a search of her car. In a bedroom of the apartment, the police found and seized a black leather jacket matching the description of the jacket worn by Defendant during the crimes and a pair of pants. The jacket and pants were admitted into evidence at trial without objection.
DNA testing performed on the jacket found in the apartment revealed the presence of a mixture of Defendant's DNA and Victim's DNA. DNA testing performed on Victim's left hand also revealed the presence of a mixture of Defendant's DNA and Victim's DNA. In addition, a swab of a stain found between an air conditioning vent and the radio in Defendant's Wife's car tested presumptively positive for blood.
The police learned Defendant was an avid gambler, and officers went to the Lumiere Casino in the City of St. Louis to obtain video surveillance footage from the morning of the crimes. The video showed a man matching Defendant's description in the casino at 2:22 a.m., which was approximately forty minutes before the Drury Inn robbery and murder.
B. Evidence Presented during Defendant's Case and Relevant Procedural Posture
Defendant called four witnesses in his defense. Defendant's daughter Latasha Taylor ("Defendant's Daughter" or "Daughter") testified that on the morning of the crimes, Defendant was with her in Poplar Bluff, he was sick, and she was taking care of him. Defendant's Wife testified she spoke with her Daughter on the phone on the morning of the crimes and Daughter was taking care of Defendant. Defendant also called Lindsey as a witness *92 and attempted to show, inter alia , that the black car she saw at the hotel was a Honda rather than a Hyundai. Finally, Defendant called Detective Herzberg and questioned him regarding, inter alia , his collection of DNA buccal swabs from Defendant.
At the conclusion of the presentation of Defendant's case, his attorney Celestine Dotson ("Ms. Dotson") told the court she wanted to present evidence regarding three gas-station armed robberies committed in the St. Louis area by a person the media referred to as the "Bulls Hat Bandit." The State made an oral motion to exclude the evidence, and the trial court granted the State's motion.
C. Other Relevant Procedural Posture
Prior to trial, Defendant made a motion for a continuance on the grounds his private counsel, whom Defendant retained approximately two weeks prior to trial, needed more time to prepare. Defendant also filed a pre-trial motion to suppress the evidence seized during the search of the apartment in Poplar Bluff. The trial court denied both motions after holding pre-trial hearings.
After hearing all of the evidence, including that which is set out above in Sections I.A. and I.B., the jury found Defendant guilty of one count of first-degree murder (Count I), one count of first-degree robbery (Count III), and two counts of armed criminal action (Counts II and IV). Defendant then filed a motion for a new trial, alleging in relevant part that the trial court erred in excluding evidence regarding the Bulls Hat Bandit, the trial *93 court erred in denying his motion for a continuance, and the trial court erred in denying Defendant's motion to suppress. However, Defendant's motion for new trial did not allege the trial court erred in admitting Detective Herzberg's testimony regarding Johnson's identification of Defendant as the person in the hotel's video surveillance footage.
The trial court denied Defendant's motion for a new trial and entered a judgment in accordance with the jury's verdict. The court then sentenced Defendant as a prior and persistent offender to life imprisonment without the possibility of parole for Count I and twenty years of imprisonment for Counts II-IV. The trial court ordered the sentences for Counts I-III to run consecutively with each other but concurrently with the sentence for Count IV; in other words, Defendant was sentenced to a total sentence of life imprisonment without the possibility of parole plus forty years of imprisonment. Defendant appeals.[1]
II. DISCUSSION
Defendant raises four points on appeal. In his first point, Defendant contends the trial court committed reversible error in denying his motion to suppress and admitting into evidence the black leather jacket and pants seized during the search of the apartment located at 640 Lindsay Street in Poplar Bluff. In his second point, Defendant asserts the trial court erred in excluding evidence regarding three gas-station armed robberies committed in the St. Louis area by a person the media referred to as the "Bulls Hat Bandit." In his third point, Defendant argues the trial court erred in admitting Detective Herzberg's testimony regarding Veneto Johnson's identification of Defendant as the person in the hotel video surveillance footage that was released to the media. And in his fourth point, Defendant claims the trial court erred in denying his motion for a continuance.
A. The Trial Court's Denial of Defendant's Motion to Suppress and Admission of Evidence Seized in the Apartment
In Defendant's first point on appeal, he contends the trial court committed reversible error in denying his motion to suppress and admitting into evidence the black leather jacket and pants seized during the search of the apartment located at 640 Lindsay Street in Poplar Bluff. This claim was not properly preserved for appeal, because although Defendant filed a motion to suppress and included this issue in his motion for a new trial, he did not object to the black leather jacket and pants when they were offered into evidence at trial. See State v. Reed , 422 S.W.3d 495, 498 (Mo. App. E.D. 2014) ; see also State v. Walter , 479 S.W.3d 118, 123 (Mo. banc 2016).
1. Standard of Review
Where, as in this case, a defendant fails to preserve an issue for appeal, his claim may only be reviewed for plain error at this Court's discretion, which we choose to exercise here. See State v. McKay , 411 S.W.3d 295, 304 (Mo. App. E.D. 2013) ; Missouri Supreme Court Rule 30.20 (2017).[2] Under the plain-error standard of review, we will only grant a defendant relief if we find an error occurred and the error affected his rights so substantially that a manifest injustice or miscarriage of justice resulted. Id. ; State v. Brown , 996 S.W.2d 719, 732 (Mo. App. W.D. 1999). A plain error is one that is evident, obvious, and clear, and our Court determines whether such an error exists based on the circumstances of each case. McKay , 411 S.W.3d at 304-05. The defendant has the burden of demonstrating a manifest injustice or miscarriage of justice resulted from the trial court's alleged error. Id. at 304.
At a hearing on a motion to suppress, the State has the burden of establishing by a preponderance of the evidence that the motion should be denied. Reed , 422 S.W.3d at 498. In reviewing the trial court's ruling on the motion to suppress, an appellate court considers the evidence presented at the pre-trial hearing and at trial to determine whether the trial court's decision is supported by sufficient evidence. Id. Our Court views the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision, and we disregard any contrary evidence and inferences. State v. Davis , 505 S.W.3d 401, 404 (Mo. App. E.D. 2016) ; Reed , 422 S.W.3d at 498. In addition, this Court defers to the trial court's factual findings and credibility determinations. Reed , 422 S.W.3d at 498. However, we review questions of law, including whether police conduct allegedly violates the Fourth Amendment, de novo. Davis , 505 S.W.3d at 404 ; State v. Nylon , 311 S.W.3d 869, 884 (Mo. App. E.D. 2010).
2. Relevant Evidence and the Trial Court's Findings
In this case, Officer Morgan of the Poplar Bluff Police Department testified he conducted a traffic stop of the vehicle Defendant's Wife Connie Bowens was driving, she took the officer to Defendant's location outside the apartment on Lindsay Street in Poplar Bluff, and Defendant was placed under arrest without incident. Wife then gave Officer Morgan consent to search the apartment by signing a written consent-to-search form, and she went with Officer Morgan and Captain David Sutton inside the apartment.
*94 Defendant's Wife, Officer Morgan, and Captain Sutton then went into the bedroom Wife occupied, which contained some of her personal items. In the bedroom, the officers found and seized the black leather jacket matching the description of the jacket worn by Defendant during the crimes and a pair of pants; both of these items were admitted into evidence at trial without objection.
Officer Morgan testified he believed Defendant's Wife had the authority to consent to the search of the apartment because she told him she lived there, she said she paid a portion of the rent and had personal property in one of the bedrooms, she had a key, and she immediately pointed out her own laundry that was sitting in the kitchen when they first walked into the apartment. Officer Morgan testified he only had contact with Defendant's Wife in the relevant timeframe leading up to the search of the apartment, and he did not remember having Wife call her Daughter Latasha Taylor to attempt to gain her consent. The officer further testified there was no debate as to whether he would need to gain access to the apartment by getting the consent of Defendant's Daughter, and he never talked to Daughter.
Defendant's Daughter gave a different version of the events during her testimony at the pre-trial hearing on the motion to suppress. She testified that on the day of the search of the apartment, she stepped outside barefoot and officers approached her. The officers asked Daughter to search the apartment, but she refused to give consent. Defendant's Daughter then went to the store to buy some shoes, and while she was gone, Officer Morgan had her mother call her to try to get Daughter to consent to a search but she said "no." When Defendant's Daughter returned from the store, she found the officers had entered and searched the apartment. She testified that although she was the only person on the lease of the apartment and her mother did not live there, her mother occasionally stayed overnight in the guest bedroom and had personal property in the room.
After hearing the preceding testimony, the trial court denied Defendant's motion to suppress, finding in relevant part:
The [c]ourt does find the testimony of Poplar Bluff Police Officer Jason Morgan to be credible. The [c]ourt further finds that the facts available to Officer Morgan and the other Poplar Bluff police officers, specifically that [Defendant's Wife] indicated that she lived at 640 Lindsay ... that she paid part of the rent there, she had a key to the apartment, she had personal property inside the apartment, [she] had her own bedroom, I think supports the officers' reasonable belief that [Defendant's Wife], in fact, had common authority over the apartment and therefore had authority to consent to [the] search [of] the apartment.
3. Whether the Trial Court's Rulings were Erroneous
We first turn to whether the trial court's denial of Defendant's motion to suppress and the admission of the black leather jacket and pants seized in the apartment were erroneous. Defendant claims the evidence was seized in violation of his Fourth Amendment rights.
As a general rule, a search of premises that is conducted without a warrant is unreasonable and violates an individual's Fourth Amendment rights. State v. Lewis , 17 S.W.3d 168, 170 (Mo. App. E.D. 2000). However, a search conducted with valid consent is a well-recognized exception to the warrant requirement and is constitutionally permitted. Id. ;
*95 State v. Rollins , 882 S.W.2d 314, 318 (Mo. App. E.D. 1994). In order to establish valid consent, the State must prove by a preponderance of the evidence that the person who gave the consent did so voluntarily and had the authority to give it. State v. Smith , 966 S.W.2d 1, 7 (Mo. App. W.D. 1997) ; see Davis , 505 S.W.3d at 404 ; Lewis , 17 S.W.3d at 170. In addition, if officers involved in a search reasonably believed the person granting consent to the entry of the residence had the authority to do so, a warrantless search based on voluntary consent is valid. Davis , 505 S.W.3d at 404 and Lewis , 17 S.W.3d at 170 and Smith , 966 S.W.2d at 7 (all citing portions of Illinois v. Rodriguez , 497 U.S. 177, 185-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) )
"The law is well settled that the consent to search of one person who possesses 'common authority' over the premises is valid as against the absent, nonconsenting person with whom authority is shared." Lewis , 17 S.W.3d at 170 (quotations omitted). Generally, a person possesses common authority over the premises if she has joint access to or control of the area being searched. Smith , 966 S.W.2d at 7, 8.
In this case, Defendant does not dispute his Wife's consent to the search of the apartment was voluntary. Instead, Defendant only contends his Wife did not have the authority to consent to the search in part because his Daughter did not consent to the search.
As previously stated, our standard of review requires us to view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision and disregard contrary evidence and inferences. Davis , 505 S.W.3d at 404 ; Reed , 422 S.W.3d at 498. Pursuant to that standard, one could reasonably infer from Officer Morgan's testimony regarding his lack of contact with Defendant's Daughter that she was not present at the apartment in the relevant timeframe leading up to and during Wife's consent to the search. Nevertheless, even assuming arguendo the trial court believed Defendant's Daughter's testimony that she was present at the apartment on the day of the search, Daughter's own testimony establishes she was out buying shoes and absent from the premises at the time Defendant's Wife consented to the search. Under either scenario, Daughter was absent from the apartment when Wife consented to the search.
In addition, as the trial court found, Officer Morgan's testimony demonstrated Wife told the officer she lived at the apartment, she paid part of the rent there, she had a key to the apartment, she had personal property inside the apartment, and she had her own bedroom. This constitutes sufficient evidence from which the trial court could have found Officer Morgan reasonably believed Wife had common authority over the apartment, and we defer to the trial court's factual findings and express determination that Officer Morgan's testimony was credible. See Reed , 422 S.W.3d at 498 ; Smith , 966 S.W.2d at 7, 8.
Because there was sufficient evidence to support a finding that Daughter was absent from the apartment at the time Wife consented to the search and to support a finding that Officer Morgan reasonably believed Wife had common authority over the apartment, Wife's authority to consent to a search of the apartment was valid against any authority shared by her nonconsenting Daughter. See Davis , 505 S.W.3d at 404 ; Lewis , 17 S.W.3d at 170 ; Smith , 966 S.W.2d at 7 ; see also Rodriguez , 497 U.S. at 185-89, 110 S.Ct. 2793. Accordingly, the search of the apartment was constitutionally permitted and did not violate Defendant's Fourth Amendment rights. See Lewis , 17 S.W.3d at 170 ;
*96 Rollins , 882 S.W.2d at 318. Furthermore, the trial court did not err, plainly or otherwise, in denying Defendant's motion to suppress the black leather jacket and pants seized in the apartment and did not err in admitting the evidence at trial. See id.
4. Whether a Manifest Injustice or Miscarriage of Justice Resulted from the Trial Court's Ruling
Defendant's first point on appeal lacks merit for the additional and independent reason that no manifest injustice or miscarriage of justice resulted from the trial court's ruling. See McKay , 411 S.W.3d at 304 ; Rule 30.20. A manifest injustice or miscarriage of justice does not result from a trial court's denial of a motion to suppress and the admission of evidence when the record demonstrates there was other overwhelming evidence of the defendant's guilt that he does not challenge or which was admissible. State v. Beasley , 416 S.W.3d 357, 364-68 (Mo. App. E.D. 2013) ; State v. Williams , 9 S.W.3d 3, 11-13 (Mo. App. W.D. 1999) ; see State v. Carr , 50 S.W.3d 848, 855 (Mo. App. W.D. 2001).
In this case, Dasha Lindsey and James Montgomery both testified at trial and identified Defendant as the man they saw in the Drury Inn parking lot immediately before and after the crimes. Lindsey also told police Defendant was in a black Hyundai. In addition, hotel video surveillance footage shown to the jury clearly showed the assailant's face and clothing, the video was shown to the jury, and two persons, Police Chief Tony Jones and Veneto Johnson, identified Defendant as the man in the video. Johnson also provided a phone number for Defendant, and historical GPS data showed Defendant's phone was traveling in the City of St. Louis and stopped in the area near the hotel in the minutes prior to Victim's murder. Furthermore, the State demonstrated Defendant had a motive for the crimes (to obtain or recoup gambling money) by presenting testimony he was an avid gambler and presenting video surveillance footage showing Defendant was in a St. Louis casino forty minutes before the Drury Inn robbery and murder. Additionally, at the time of his arrest, Defendant was wearing the same type of shoes as the person Lindsey and Montgomery saw in the hotel parking lot. And after Defendant's Wife consented to a search of her black Hyundai, which was the same type of car Defendant was seen in at the hotel, a swab of a stain found in the car tested presumptively positive for blood. Finally, DNA testing performed on Victim's left hand revealed the presence of a mixture of Defendant's DNA and Victim's DNA.
Because we find the aforementioned evidence constitutes overwhelming evidence of Defendant's guilt that he does not challenge or which we find to be admissible,[3] no manifest injustice or miscarriage of justice resulted from the trial court's denial of the motion to suppress and admission of the evidence seized in the apartment. See id.
5. Conclusion as to Point One
Because the trial court did not err in denying Defendant's motion to suppress and in admitting the evidence seized in the apartment, and because the trial court's rulings did not affect Defendant's rights so substantially that a manifest injustice or miscarriage of justice resulted, Defendant is not entitled to plain-error relief. See McKay , 411 S.W.3d at 304-05 ; Rule 30.20 ; Brown , 996 S.W.2d at 732. Point one is denied.
*97 B. The Trial Court's Exclusion of Evidence Regarding the "Bulls Hat Bandit"
In his second point on appeal, Defendant asserts the trial court erred in excluding evidence regarding three gas-station armed robberies committed in the St. Louis area by a person the media referred to as the "Bulls Hat Bandit."
1. Standard of Review
Generally, an allegation that the trial court erred in excluding evidence is preserved for appeal when a sufficient offer of proof is made and the complained-of error is raised in the defendant's motion for a new trial. See State v. Prine , 456 S.W.3d 876, 882 (Mo. App. S.D. 2015). For purposes of this opinion only, we assume Defendant's offer of proof was sufficient. See State v. Murphy , 534 S.W.3d 408, 415 (Mo. App. E.D. 2017) (a defendant's offer of proof must, inter alia , demonstrate the relevancy of the offered evidence, be specific, and be definite). In addition, the exclusion of Bulls Hat Bandit evidence was raised in Defendant's motion for a new trial. Under these circumstances, we find the issue is preserved for appeal. See Prine , 456 S.W.3d at 882.
It is within a trial court's broad discretion to admit or exclude evidence at trial and an evidentiary ruling is reviewed for an abuse of discretion. State v. Hood , 451 S.W.3d 758, 765 (Mo. App. E.D. 2014). A trial court abuses its discretion when its decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Id. We will only reverse an evidentiary error if prejudice is demonstrated, i.e., if there is a reasonable probability the trial court's alleged error affected the outcome of the trial. Id.
2. Defendant's Offer of Proof
At the conclusion of Defendant's evidence, his attorney Ms. Dotson told the court she wanted to present evidence of allegedly similar crimes committed by an alternative perpetrator. Ms. Dotson stated she received an email from Defendant's wife on the second day of trial containing "a KMOV article that described an assailant as 'the Bulls Hat Bandit' who had made three arm[ed] robberies ... in the St. Louis area." Ms. Dotson alleged the Bulls Hat Bandit had a modus operandi that allegedly "seemed to parallel" the charges against Defendant. Ms. Dotson told the court she wanted to present testimony from Captain Don Thurman, who had been subpoenaed and indicated he was willing to testify. Ms. Dotson stated Captain Thurman's testimony would offer "insight into the possibility of a[n] alternative suspect," because he was "aware of the particulars of the incidents involving th[e] 'Bulls Hat Bandit' " and he was leading the investigation.
As part of Defendant's offer of proof, Ms. Dotson submitted Defendant's Wife's email and the accompanying KMOV article titled "Bulls Hat Bandit: Man wanted for 3 armed gas station robberies." The article contained pictures of the assailant wearing a hat and pointing a gun at gas station workers in the first two robberies. In addition, the article stated the suspect, who pointed a gun at the back of victims' heads in the last robbery committed around the time of May 10, 2015, was becoming more violent with each crime. The article also stated the three gas-station armed robberies were "similar," no injuries had been reported in any of the crimes, and the police believed they were all committed by the same man. Finally, the article indicated the robberies were committed in three different locations in the St. Louis area-West Alton, South City, and St. Charles.
*98 3. Whether the Trial Court's Ruling Constituted an Abuse of Discretion
In this case, Defendant argues the trial court abused its discretion in excluding evidence regarding the Bulls Hat Bandit because, like the suspect in this case, the Bulls Hat Bandit wore a Chicago Bulls hat during the crimes, used a gun during the crimes, and committed the crimes in the St. Louis area. Defendant claims the evidence was admissible to show, (a) a shared modus operandi between the gas-station armed robberies and the Drury Inn robbery and murder; and (b) the Bulls Hat Bandit was an alternative perpetrator in this case.
a. Whether the Evidence was Admissible to Show a Shared Modus Operandi
As explained by the Missouri Supreme Court in State v. Bowman , "[t]he modus operandi cases generally involve instances in which a defendant is challenging the admissibility of similar uncharged conduct used to prove the defendant's identity as the perpetrator of the charged crime." 337 S.W.3d 679, 686 (Mo. banc 2011) (emphasis added).[4] However, the defendant in Bowman made an argument on appeal similar to the one Defendant makes here, claiming evidence demonstrating an alternative perpetrator committed other crimes was admissible to prove a shared modus operandi between those crimes and the offenses for which the defendant was convicted. See id. at 683, 686.
In order for similarities between crimes to establish a specific person's modus operandi , there must be more than "mere similarity" between crimes. Id. at 686-87. Instead, the crimes "must be nearly 'identical' and the methodology 'so unusual and distinctive' that the crimes resemble a 'signature' " of the same person's involvement in multiple crimes. Id. (quotations omitted). As indicated in State v. Davis , 211 S.W.3d 86 (Mo. banc 2006), "[t]he bar for establishing a modus operandi is high." Bowman , 337 S.W.3d at 686 ((similarly characterizing Davis ) (emphasis added)).
In Davis , two defendants were charged with committing, inter alia , a robbery at a grocery store. 211 S.W.3d at 87. At trial, the court permitted the State to introduce evidence identifying the two defendants as perpetrators of another robbery committed at a bar four days earlier. Id. The Missouri Supreme Court found there were multiple similarities between the two robberies: they occurred within five miles of one another; they were both perpetrated by two stocky white men carrying similar guns and wearing dark ski masks and gloves; in both incidents one man was taller than the other and one man called the other "Ed"; and in both crimes the robbers took cash and rolled coins. Id. at 89. Despite *99 these multiple similarities, the Supreme Court held the two robberies were neither identical nor sufficiently unusual and distinctive to be admissible to show any specific person's modus operandi because the two incidents were different in several respects. Id. Differences between the two crimes included: the type of business being robbed; in one incident the shorter man did the talking and in the other incident the taller robber spoke; the grocery store robbers told the victims no one would get hurt while the bar robbers threatened to shoot a customer; and both robbers collected money at the grocery store but at the bar only one person collected money while the other watched the door. Id. at 87, 89.
In this case, the similarities between the three gas-station armed robberies and the Drury Inn robbery and murder "are substantially fewer than the similarities between the two robberies at issue in Davis ." See Bowman , 337 S.W.3d at 687 (similarly finding). The only similarities here are that a Chicago Bulls hat was worn by the suspect, a gun was used, and they were all committed in the St. Louis area. As indicated in Davis , evidence merely showing the perpetrator in multiple crimes wore the same apparel, used a gun, and committed the crimes in the same area is not sufficient to establish a signature where, as here, there are multiple differences between the crimes including the type of business being robbed and the perpetrator's level of violence against the victims. See 211 S.W.3d at 87, 89. In this case, the offenses involving the Bulls Hat Bandit were all robberies committed at gas stations with no injuries being reported, whereas the offenses in his case involved a robbery and a murder at a hotel resulting in Victim being killed by the suspect. Under these circumstances, we hold the robberies committed by the Bulls Hat Bandit and the Drury Inn crimes do not establish a signature of the same person's involvement in all of the crimes, and therefore, the evidence regarding the Bulls Hat Bandit was not admissible to show a shared modus operandi. See Bowman , 337 S.W.3d at 683, 686-87 ; see also Davis , 211 S.W.3d at 87, 89.
b. Whether the Evidence was Admissible to Show an Alternative Perpetrator Committed the Crimes in this Case
We next turn to Defendant's argument that the evidence regarding the Bulls Hat Bandit was admissible to show there was an alternative perpetrator who committed the Drury Inn robbery and murder. "Generally, a defendant may introduce evidence tending to show that another person committed the charged offense, unless the probative value of the evidence is substantially outweighed by its costs, such as undue delay, prejudice or confusion." State v. Harding , 528 S.W.3d 362, 377-78 (Mo. App. E.D. 2017). Evidence of an alternative perpetrator is not admissible if it only casts a bare suspicion on another person or if it only raises a conjectural inference that another person committed the charged offense. State v. Shegog , 521 S.W.3d 628, 636 (Mo. App. W.D. 2017). Instead, "evidence of an alternative perpetrator is admissible only if there is proof that the other person committed some act directly connecting that person with the crime." Id. (emphasis omitted); see also Harding , 528 S.W.3d at 378 (similarly finding). In other words, the evidence must tend to "clearly point out someone besides [the] accused as the guilty person." State v. McKay , 459 S.W.3d 450, 458 (Mo. App. E.D. 2014).
Here, Defendant argues the evidence of the Bulls Hat Bandit established a direct connection between the alleged alternative perpetrator and the crimes in this case, primarily relying on *100 State v. McKay , 459 S.W.3d 450. In McKay , the defendant was convicted of first-degree robbery and armed criminal action for his alleged involvement in stealing a female-victim's cell phone at gunpoint. Id. at 451. On appeal, the defendant argued the trial court plainly erred in excluding evidence offered in support of his theory that another man named Keith Esters was an alternative perpetrator, and our Court agreed. Id. at 453-54, 458-60. The defendant's proposed evidence included proof that: the victim's cell phone was used to call Esters's girlfriend thirty minutes after the phone was stolen; gas station employees positively identified Esters as a person who sold the victim's cell phone in the presence of Esters's girlfriend; the victim recognized Esters as resembling the man who robbed her; Esters attempted to steal a cell phone from another female in the immediate vicinity eight days after the victim was robbed; Esters owned a gun like the one used in the robbery; and clothes matching the description of those worn by the suspect were concealed under Esters's sofa. Id. at 454 n.2, 459.
The evidence offered in this case is distinguishable from the "significant alternative perpetrator evidence" offered in McKay . See State v. Proudie , 493 S.W.3d 6, 12-13 (Mo. App. E.D. 2016) (similarly characterizing McKay ). As previously indicated, the only evidence allegedly connecting the Bulls Hat Bandit to the Drury Inn robbery and murder is that in all of the crimes the suspect wore a Chicago Bulls hat, the suspect used a gun, and the crimes were all committed in the St. Louis area.
In addition, whereas the evidence in McKay showed the alternative perpetrator committed a similar crime in the immediate vicinity just eight days after the occurrence of the robbery, in this case the gas-station armed robberies and the crimes at the Drury Inn were different, occurred much further apart in time, and were committed in three different locations in the St. Louis area. As previously stated, the crimes involving the Bulls Hat Bandit were all robberies committed at gas stations with no injuries being reported, whereas the crimes in this case involved a robbery and a murder at a hotel with the Victim being killed by the suspect. Furthermore, the only evidence regarding the timing of the three gas-station armed robberies is that the last one occurred around the time of May 10, 2015, which was approximately four months after the Drury Inn crimes.
Additionally, unlike the defendant's proposed evidence in McKay , the evidence of the Bulls Hat Bandit set forth in Defendant's offer of proof does not show the gun used in the gas-station armed robberies and the Drury Inn robbery and murder was a similar type of gun. And "[f]inally, the fact that the State conceded in McKay that there was enough evidence to establish a direct connection between the alternative perpetrator and the crime also sets that case apart from ours." State v. Benedict , 495 S.W.3d 185, 192 (Mo. App. E.D. 2016) (similarly distinguishing McKay , 459 S.W.3d at 458 n.5 ).
In sum, we hold the evidence that the Bulls Hat Bandit merely wore a Bulls Hat and used a gun in unrelated and dissimilar robberies in three different locations in the St. Louis area does not directly connect him to the Drury Inn robbery and murder and does not tend to clearly point to him as the guilty person in this case. At most, the evidence only raises a bare suspicion or conjectural inference that another person committed the crimes in this case. Under these circumstances, the evidence regarding the Bulls Hat Bandit was not admissible alternative perpetrator evidence. See Harding , 528 S.W.3d at 377-78 ; Shegog , 521 S.W.3d at 636 ; McKay , 459 S.W.3d at 458.
*101 c. Conclusion as to Whether the Trial Court Abused its Discretion
Based on the foregoing, Defendant has not demonstrated the evidence regarding the Bulls Hat Bandit was admissible. Therefore, the trial court did not abuse its discretion in excluding the evidence. See Harding , 528 S.W.3d at 377 (the defendant has the burden to show the trial court's ruling constituted an abuse of discretion).
4. Whether Defendant was Prejudiced from the Trial Court's Ruling
Defendant's second point on appeal lacks merit for the additional and independent reason that he has not demonstrated he was prejudiced as the result of the exclusion of evidence regarding the Bulls Hat Bandit. See Hood , 451 S.W.3d at 765. Defendant argues the exclusion of the Bulls Hat Bandit evidence affected the outcome of the trial, citing to State v. McKay , 459 S.W.3d at 455-56, 458-60, which was reviewed under a plain-error standard of review and State v. Woodworth , 941 S.W.2d 679, 690-92 (Mo. App. W.D. 1997), which was reviewed under an abuse-of-discretion standard of review. In McKay , our Court found there was a reasonable probability the trial court's error in excluding alternative perpetrator evidence affected the outcome of the trial where the State's case relied entirely on eyewitness identification, the victim was the sole witness who identified the defendant, and there was no physical evidence linking the defendant to the crime. 459 S.W.3d at 453, 458-60. And in Woodworth , the Western District found the trial court's error in excluding alternative perpetrator evidence could have affected the outcome of the trial where the State's case was "weak[ ]" and the evidence against the defendant was "tenuous" because the State did not show the defendant had a motive for the crime. 941 S.W.2d at 690-92.
The circumstances of this case are distinguishable from those in McKay and Woodworth because, as we found in detail in our discussion of Defendant's first point on appeal, there was overwhelming evidence of Defendant's guilt. See Proudie , 493 S.W.3d at 12-13 (similarly distinguishing McKay and Woodworth ). Furthermore, unlike in McKay , the State's case here did not rely entirely on eyewitness identification, there were multiple witnesses identifying Defendant as the assailant in the Drury Inn robbery and murder, and there was physical evidence linking Defendant to the crimes including the presence of a mixture of Defendant's DNA and Victim's DNA on the Victim's hand. Additionally, in contrast to the circumstances in Woodworth , in this case the State showed Defendant had a motive for the crimes (to obtain or recoup gambling money) by presenting testimony he was an avid gambler and by presenting video surveillance footage showing Defendant was in a St. Louis casino forty minutes before the Drury Inn robbery and murder took place. Ultimately, after reviewing the entire record in this case, we hold there is not a reasonable probability the trial court's exclusion of evidence regarding the Bulls Hat Bandit affected the outcome of the trial.
5. Conclusion as to Point Two
Based on the foregoing, the trial court did not abuse its discretion in excluding evidence regarding the Bulls Hat Bandit, and Defendant was not prejudiced as a result of the alleged error. Therefore, point two is denied. See Hood , 451 S.W.3d at 765.
C. The Trial Court's Admission of Detective Herzberg's Testimony Regarding Veneto Johnson's Identification of Defendant
In his third point on appeal, Defendant argues the trial court erred in *102 admitting Detective Herzberg's testimony regarding Veneto Johnson's identification of Defendant as the person in the hotel video surveillance footage that was released to the media. This claim was not properly preserved for appeal, because Defendant failed to bring an objection to the admission of this particular testimony at trial and failed to include the claim of error in his motion for a new trial. See Walter , 479 S.W.3d at 123.
1. Standard of Review
Where, as in this case, a defendant fails to preserve an issue for appeal, his claim may only be reviewed for plain error at this Court's discretion, which we choose to exercise here. See See McKay , 411 S.W.3d at 304 ; Rule 30.20. As previously stated, we will only grant a defendant relief under the plain-error standard of review if we find an error occurred and the error affected his rights so substantially that a manifest injustice or miscarriage of justice resulted. Id. ; Brown , 996 S.W.2d at 732. A plain error is one which is evident, obvious, and clear, and our Court determines whether such an error exists based on the circumstances of each case. McKay , 411 S.W.3d at 304-05. The defendant has the burden of demonstrating a manifest injustice or miscarriage of justice resulted from the trial court's alleged error. Id. at 304. Furthermore, whether the admission of challenged testimony violated a defendant's rights under the Confrontation Clause is a question of law, which an appellate court reviews de novo. State v. Justus , 205 S.W.3d 872, 878 (Mo. banc 2006).
2. Relevant Facts
After the Drury Inn robbery and murder occurred, the police downloaded video surveillance footage from the hotel, which clearly showed the assailant's face and clothing. Detective Herzberg distributed it to the media for dissemination to the public, hoping someone would recognize the person in the video, call the police, and identify him. Thereafter, Detective Herzberg received phone calls from Chief Tony Jones and Veneto Johnson. Chief Jones and Johnson both identified Defendant as the man in the video. Johnson also provided a phone number for Defendant. Chief Jones testified at Defendant's trial, but Johnson did not testify, and the information Johnson provided to police was solely adduced through the testimony of Detective Herzberg.
The following occurred during the State's direct examination of Detective Herzberg. After the detective testified Johnson called him, identified Defendant as the man in the hotel video surveillance footage, and provided a phone number for Defendant, the prosecutor asked the detective, "So after you received the phone number that may be [D]efendant's, what did you do next?" Detective Herzberg answered, "[I] [a]dvised our intelligence unit that we would like to get a search warrant for that phone for GPS historical data and call records." The detective then testified the GPS data showed Defendant's phone was traveling in the City of St. Louis and stopped in the area near the hotel in the minutes prior to Victim's murder.
3. Whether the Trial Court's Ruling was Erroneous
We first turn to whether the trial court's admission of Detective Herzberg's testimony regarding Johnson's identification of Defendant was erroneous. Defendant claims the testimony was inadmissible hearsay and violated his rights under the Confrontation Clause.
Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted and is generally inadmissible.
*103 State v. Cole , 483 S.W.3d 470, 474 (Mo. App. E.D. 2016). However, when an out-of-court statement is introduced in a trial to explain the conduct of a witness who is testifying, rather than for the statement's truth, the testimony does not constitute hearsay and is admissible. Id. ; State v. Washington , 260 S.W.3d 875, 880 (Mo. App. E.D. 2008). Accordingly, an out-of-court statement is admissible to explain subsequent police conduct in order to provide background and continuity to an officer's explanation of events "so the jury is not called upon to speculate on the reasons for the officer's later actions." State v. Drisdel , 417 S.W.3d 773, 787-88 (Mo. App. E.D. 2013) ; see Washington , 260 S.W.3d at 880. However, if such a statement goes beyond what is necessary to explain subsequent police conduct, it remains inadmissible hearsay. Drisdel , 417 S.W.3d at 788 ; Washington , 260 S.W.3d at 880.
In addition to the rule against hearsay, the U.S. Constitution's Confrontation Clause[5] prohibits a testimonial hearsay statement from being admitted against a defendant in a criminal trial unless, (1) the declarant was unavailable to testify at trial; and (2) the defendant had a previous opportunity to cross-examine the witness. Crawford v. Washington , 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, if a statement is not offered to prove the truth of the matter asserted, then the defendant's rights under the Confrontation Clause are not implicated. Id. at 59, 124 S.Ct. 1354 n.9 ; Cole , 483 S.W.3d at 474 ; see also State v. Allison , 326 S.W.3d 81, 90 (Mo. App. W.D. 2010).
When considered in the context of the State's direct examination of Detective Herzberg, we find the State offered the detective's testimony regarding Veneto Johnson's identification of Defendant as the person in the hotel video surveillance footage to explain the reason for subsequent police conduct and not to prove the truth of the matter asserted. Specifically, Detective Herzberg's testimony provided the jury with a necessary background and continuity to the detective's explanation for how he obtained the Defendant's phone number and then pursued a search warrant for GPS historical data for Defendant's phone, so the jury would not have to speculate as to the basis and reasons for the detective's actions. See Drisdel , 417 S.W.3d at 787-88 ; see also Allison , 326 S.W.3d at 89-90 (finding detective's testimony that a defendant asked a confidential informant if he "wanted any medicine" was admissible as subsequent police conduct when it provided the jury with an explanation for the detective's direction to the informant to arrange a meeting with the defendant).
Accordingly, Detective Herzberg's testimony regarding Veneto Johnson's identification of Defendant was not inadmissible hearsay and did not implicate Defendant's rights under the Confrontation Clause. See Crawford , 541 U.S. at 59 n.9, 124 S.Ct. 1354 ; Cole , 483 S.W.3d at 474 ; Drisdel , 417 S.W.3d at 787-88 ; Allison , 326 S.W.3d at 89-90. Therefore, the trial court did not err, plainly or otherwise, in admitting the challenged testimony.
4. Whether a Manifest Injustice or Miscarriage of Justice Resulted from the Trial Court's Ruling *104 Defendant's third point on appeal lacks merit for the additional and independent reason that no manifest injustice or miscarriage of justice resulted from the trial court's ruling. See McKay , 411 S.W.3d at 304 ; Rule 30.20. A manifest injustice or miscarriage of justice does not result from the admission of evidence alleged to be inadmissible hearsay where our Court determines from the record that "the jury would have reached the same verdict even if the out-of-court statements had not been admitted into evidence." Washington , 260 S.W.3d at 879, 881. Factors to be considered in making this determination include whether there was overwhelming evidence of Defendant's participation in the charged crimes, whether the challenged out-of-court statements were cumulative to other evidence, and whether any questions asked by the jury to the court would indicate the jury relied on the out-of-court statements as proof of the Defendant's guilt. See id. ; see also Cole , 483 S.W.3d at 475-76.
All of the preceding factors are present in this case. As indicated in our discussion of Defendant's first point on appeal, there was overwhelming evidence of Defendant's guilt, even without Detective Herzberg's testimony regarding Johnson's identification of Defendant. Additionally, Johnson's identification of Defendant as the person in the hotel video surveillance footage was cumulative to testimony establishing Chief Tony Jones similarly identified Defendant as the person in the video. Finally, there is nothing in the record on appeal indicating the jury asked any question during deliberations concerning Johnson's identification of Defendant. In fact, the only question asked by the jury during deliberations was a request to get "all pictures from the Drury Inn, [the] Lumiere [casino], [ ] the mug shot of [D]efendant[,]" "the slowed down footage from the Drury Inn[,] and the footage of the assailant leaning over the service desk of the Lumiere." The jury's request, which was granted, indicates the jury relied on the aforementioned pictures and footage as proof of Defendant's guilt rather than relying on Johnson's out-of-court statements. See Cole , 483 S.W.3d at 475-76. Under these circumstances, we conclude from the record that the jury would have reached the same verdict even if Johnson's out-of-court statement had not been admitted into evidence and therefore, no manifest injustice or miscarriage of justice resulted from the trial court's admission of the challenged portion of Detective Herzberg's testimony. See Washington , 260 S.W.3d at 879, 881 ; Cole , 483 S.W.3d at 475-76.
5. Conclusion as to Point Three
Because the trial court did not err in admitting Detective Herzberg's testimony regarding Johnson's identification of Defendant, and because the trial court's ruling did not affect Defendant's rights so substantially that a manifest injustice or miscarriage of justice resulted, Defendant is not entitled to plain-error relief. See McKay , 411 S.W.3d at 304-05 ; Rule 30.20 ; Brown , 996 S.W.2d at 732. Point three is denied.
D. The Trial Court's Denial of Defendant's Motion for a Continuance
In Defendant's fourth and final point on appeal, he claims the trial court erred in denying his motion for a continuance. This issue is preserved for appeal because it was raised in Defendant's motion for a new trial. See State v. Wolf , 91 S.W.3d 636, 644-45 (Mo. App. W.D. 2002).
1. Standard of Review and General Law
The decision to grant or deny a defendant's motion for a continuance is within the trial court's sound discretion.
*105 State v. Brown , 517 S.W.3d 617, 627 (Mo. App. E.D. 2017). "Nevertheless, whether a trial court committed reversible error in denying a motion for a continuance is determined by considering the circumstances of each case." Id. (quoting State v. Litherland , 477 S.W.3d 156, 163 (Mo. App. E.D. 2015) ). Our Court will only reverse a trial court's denial of a defendant's motion for a continuance if he makes a strong showing the court abused its discretion and that he was prejudiced as a result of the denial of the motion. Brown , 517 S.W.3d at 627. A trial court's ruling constitutes an abuse of discretion when it "is clearly against the logic of the circumstances then before [the court] and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id. at 628 (quoting Litherland , 477 S.W.3d at 163 ).
Some of the factors an appellate court considers in determining whether a trial court committed reversible error in denying a defendant's motion for a continuance include "the implication of a defendant's constitutional rights, the seriousness of the offense charged, the nature of any potential defense defendant claims he was unable to prepare for and present at trial, and whether counsel had ample opportunity to prepare for trial." Brown , 517 S.W.3d at 628-35.
2. Relevant Facts Including the Trial Court's Findings
In this case, the State filed its indictment charging Defendant on February 24, 2015. Between March 6 and April 21, Defendant's case was continued four times because he indicated he was hiring private counsel but he did not do so during that timeframe. On April 23, public defender Megan A. Beesley ("Ms. Beesley") entered her appearance for Defendant, and Defendant was arraigned on April 30.
On November 12, Defendant filed a motion to change appointed counsel, which was denied after a hearing that was held on January 5, 2016.[6] At the January 5 hearing, Defendant told the court, "I'm going to do all I can to obtain a private attorney." In addition, the trial court stated on the record it was setting Defendant's case for trial on Monday, April 4, 2016.[7]
On March 21, 2016, which was two weeks before Defendant's case was set for trial, Defendant retained Ms. Dotson as private counsel and she entered her appearance for Defendant. On March 22, Ms. Dotson made an oral motion for a continuance on behalf of Defendant, and the trial court held a hearing on the motion on that same date. Defendant requested a continuance on the grounds Ms. Dotson needed more than two weeks to prepare for trial to "explore some alternatives to [Defendant's] defense," including consulting with a DNA expert. The prosecuting attorney opposed Defendant's motion, noting Defendant had been considering hiring private counsel since his first continuance in March 2015, the State was ready for trial, and the April 4, 2016 trial setting was selected after coordinating with the schedules of officers from multiple police departments.
The trial court denied Defendant's motion for a continuance, finding that although Defendant had a right to hire a lawyer of his own choosing, "he can't just hire somebody at the 11th hour and then ask for a continuance based upon that." The trial court informed Ms. Dotson it was *106 up to her and Defendant to talk about whether he still wanted her to be his trial counsel given the amount of time she would have to prepare, and the court gave Defendant a few days to make a decision. The trial court also informed Ms. Beesley she could withdraw as Defendant's counsel if Defendant decided to continue to retain Ms. Dotson. On March 28, 2016, the trial court entered an order allowing Ms. Beesley to withdraw from the case, and the case proceeded to trial on April 5-8 with Ms. Dotson representing Defendant.
3. Whether the Trial Court's Ruling Constituted an Abuse of Discretion
Defendant argues the trial court abused its discretion in denying his motion for a continuance because Ms. Dotson, whom Defendant retained as his private counsel two weeks before his case was set for trial, did not have adequate time to prepare. Defendant primarily relies on two cases: State v. Brown , 517 S.W.3d 617 and State v. Litherland , 477 S.W.3d 156. In Brown and Litherland , like in this case, each defendant appealed an underlying conviction for first-degree murder and the denial of a motion for a continuance. 517 S.W.3d at 619, 627 ; 477 S.W.3d at 157, 163. Although the seriousness of a first-degree murder conviction was one of the factors discussed in Brown and Litherland , there were additional circumstances that led our Court to determining the trial court abused its discretion in denying the defendant's motion for a continuance in each case. 517 S.W.3d at 628-31 ; 477 S.W.3d at 163-65.
In Brown , our Court found an abuse of discretion where the defendant's mental state was repeatedly questioned by his attorneys and the multiple trial judges presiding over the case, and the defendant's attorneys were unable to prepare for the potential defense of mental disease or defect excluding responsibility because it was undisputed they were completely unable to discuss the defendant's case with him prior to trial. 517 S.W.3d at 628-31. And in Litherland , our Court found the trial court abused its discretion in denying the defendant's motion for a continuance based on the temporary unavailability of her sole defense witness going into labor on the morning of trial. 477 S.W.3d at 163-65. Because none of the preceding circumstances are present in this case, Brown and Litherland are distinguishable.
Turning to the circumstances of this case, Defendant only argues Ms. Dotson, whom Defendant retained as his private counsel two weeks before his case was set for trial, did not have adequate time to prepare. Although a defendant has the right to hire private counsel, that right is not unlimited. State v. Leigh , 621 S.W.2d 515, 517 (Mo. App. E.D. 1981) (citing State v. Crider , 451 S.W.2d 825, 828 (Mo. 1970) ). "[A] trial court is not required to grant a continuance when the [d]efendant voluntarily obtains private counsel on the eve of trial, nor is the court obligated to force appointed counsel to assist the new counsel." State v. Cartwright , 17 S.W.3d 149, 154 (Mo. App. E.D. 2000) (citing Crider , 451 S.W.2d at 827 ).
Furthermore, multiple Missouri courts have held that where a defendant's motion for a continuance is based on counsel's lack of an ample opportunity to prepare for trial, a trial court does not abuse its discretion in denying the motion under circumstances where a defendant's own actions in changing attorneys shortly before trial created the complained-of situation. See, e.g., State v. Miller , 466 S.W.3d 635, 637 (Mo. App. S.D. 2015) ; State v. Baller , 949 S.W.2d 269, 273 (Mo. App. E.D. 1997) ; State v. Cheesebrew , 575 S.W.2d 218, 224-25 (Mo. App. 1978). Those are precisely the circumstances here.
In this case, the record reflects Defendant considered retaining private counsel five times between March 6, 2015 and January *107 5, 2016. Although Defendant became aware at the January 5 hearing that his case was set for trial on April 4, 2016, Defendant did not retain private counsel until March 21, 2016, which was approximately two-and-a-half months after the hearing and two weeks before the trial setting. As other appellate courts have found under similar facts, we find any complaint of inadequate time for Ms. Dotson to prepare Defendant's case "rests squarely on the shoulders of [Defendant]," as it was his conduct in changing attorneys just two weeks before his trial setting that created the alleged problem. See Miller , 466 S.W.3d at 637 (similarly finding where the defendant hired new counsel less than two weeks before trial) (quotations omitted); Baller , 949 S.W.2d at 273 (similarly finding where the defendant hired new counsel approximately twenty days before trial); Cheesebrew , 575 S.W.2d at 224-25 (similarly finding where the defendant hired new counsel approximately two weeks before trial). Under these circumstances, the trial court did not abuse its discretion in denying Defendant's motion for a continuance. See id. (all similarly finding). Point four is denied.[8]
III. CONCLUSION
The trial court's judgment is affirmed.
Gary M. Gaertner, Jr., P.J., and Angela T. Quigless, J., concur.

To avoid unnecessary repetition, additional facts relevant to each of Defendant's points on appeal will be set forth in Sections II.A., II.B., II.C., and II.D. of this opinion.

All further references to Rules are to Missouri Supreme Court Rules (2017).

The only evidence discussed in this section that is challenged on appeal is Veneto Johnson's identification of Defendant. We find this evidence was admissible for the reasons discussed below in Section II.C.3. of this opinion.

As explained in State v. McBenge ,"[e]vidence is logically relevant under the identity exception if the identity of the wrongdoer is at issue, and the State demonstrates the defendant is the perpetrator who has committed the charged crime by showing defendant or his accomplice has committed other uncharged acts which are sufficiently similar to the crime charged with respect to time, place, and method."507 S.W.3d 94, 116 (Mo. App. E.D. 2016). The Missouri Supreme Court has referred to the preceding exception as the "identity exception" and the "modus operandi exception" and has used both of those terms in differing ways. Id. at 116 n.18. Nevertheless, "the standard the Missouri Supreme Court has adopted to determining whether evidence is admissible is the same and is the one we use below in this case." Id. (citing Bowman , 337 S.W.3d at 686-87, State v. Davis , 211 S.W.3d 86, 88-89 (Mo. banc 2006), and State v. Bernard , 849 S.W.2d 10, 17 (Mo. banc 1993) (partially superseded on other grounds)). For purposes of this appeal, we will generally refer to the term "modus operandi " rather than "identity."

Pursuant to the Sixth Amendment to the U.S. Constitution, "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Justus , 205 S.W.3d at 878 (quoting U.S. Const. Amend. VI ). The Missouri Constitution protects the same right to confrontation. Justus , 205 S.W.3d at 878 ; see also Mo. Const. Art. 1, section 18(a).

Because Defendant does not challenge the denial of his motion for a change of appointed counsel on appeal, it is unnecessary for us to discuss it in detail.

Defendant's trial actually began the next day.

We note Defendant argues he was prejudiced by the trial court's denial of his motion for a continuance because Ms. Dotson did not have time to hire or consult with a DNA expert or further look into the evidence regarding the Bulls Hat Bandit that is discussed above in Section II.B. However, our holding that the trial court did not abuse its discretion in denying Defendant's motion for a continuance is dispositive of Defendant's fourth point on appeal, and therefore, it is unnecessary for our Court to discuss whether Defendant made a sufficient showing that he was prejudiced as a result of the denial of his motion. See Brown , 517 S.W.3d at 627 (our Court will only reverse a trial court's denial of a defendant's motion for a continuance if he makes a strong showing the court abused its discretion and that he was prejudiced as a result of the denial of the motion).