STATE of Missouri, Respondent,

v.

Anthony SHEGOG, Appellant.

WD 79174

Missouri Court of Appeals,
Western District.

Opinion filed: March 7, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2017

Application for Transfer Denied June 27, 2017

Christine K. Lesicko, for Respondent.

Ellen H. Flottman, for Appellant.

Before Division One: James E. Welsh, Presiding Judge, Anthony Rex Gabbert, Judge and Edward R. Ardini, Jr., Judge

EDWARD R. ARDINI, JR., JUDGE

Anthony Shegog ("Shegog") appeals his conviction of murder in the second degree following a jury trial. Shegog claims that the trial court erred in overruling his motion to suppress evidence seized during searches of his apartment and in denying the admission of certain hearsay testimony during trial. Because we find no error, the judgment of the trial court is affirmed.

**Factual and Procedural Background** [1]

On October 6, 2014, Julie Davis ("Davis") was alerted to a commotion coming from outside of her house and went to investigate. Stepping onto her back porch, she observed a man and two women screaming and yelling at one another as they walked up and down the street at the side of her residence. She also observed a body, later determined to be that of Walter Liege ("victim"), lying nearby on the ground between her house and the neighboring two-story, four-unit apartment building. Police soon arrived on the scene and interviewed Davis who related her information to them. The police were able to identify the man and one of the women who had been observed by Davis to be screaming and yelling at one another as Shegog and his girlfriend. After speaking with Davis, Police proceeded to question Shegog who was standing outside of the apartment building. Shegog stated that he had been asleep in his apartment until being awakened by his girlfriend informing him that she had discovered the victim's body. When asked whether he knew anything about the victim, Shegog initially responded by stating that the victim's name was Jeffery, but quickly altered his answer and provided the victim's real name, including its rather unusual pronunciation. Shegog then informed the officer that he knew nothing about the crime or the victim and retreated into his apartment.

During this time, additional officers arrived on the scene to aid the investigation. Two officers entered the common area of the apartment building to locate additional witnesses. Upon entering, the officers heard an argument coming from the second floor and, upon reaching the landing, observed Shegog's girlfriend leaving his apartment in tears while Shegog continued to yell at her through the open doorway. One of the officers approached and questioned Shegog while the other officer questioned Shegog's girlfriend. Shegog was uncooperative, simply repeating several times his previous statement that he had been asleep until being awakened by his girlfriend after she had discovered the victim's body. Shegog's girlfriend meanwhile informed officers that the body had been stabbed, a fact the officers believed could not have been known to anyone who did not closely examine the body.

Shegog initially expressed reluctance when requested to go to the police station for the purpose of providing a statement, but ultimately agreed to do so after his girlfriend decided to provide a statement to police. The officers noted that the girlfriend's willingness to provide a statement caused Shegog to become visibly upset, and that he grew more upset when informed that he would not be permitted to ride with her in the same patrol car. While leaving the scene to go to the police sta-

---

1. We view the facts and all reasonable inferences in the light most favorable to the trial court's ruling. *State v. Mays*, 501 S.W.3d 484, 491 (Mo. App. W.D. 2016)

tion, Shegog began telling his girlfriend "I was asleep right?" in what the officers considered to be a manner that was not intended to be a question.

■ At this point, the police performed what they referred to as a protective sweep of Shegog's apartment.[2] The primary reason for searching the apartment was the unknown whereabouts of the unidentified woman whom Davis reported to have seen screaming and yelling with Shegog and his girlfriend in the area of the victim's body. The officers testified that they were concerned that this woman may still have been in the apartment, either injured or possibly disposing of evidence. During the search of the apartment, the officers discovered a knife, with what appeared to be blood on it, lying in plain view on the kitchen counter. Police also continued gathering evidence from outside of the apartment including what appeared to be dried blood on the doorframe that lead from Shegog's apartment to a small wooden exterior staircase that connected the second story apartment with the ground level, local security footage from the time the stabbing was believed to have occurred that showed what appeared to be the victim exiting the apartment building with other people using the exterior staircase leading from Shegog's apartment, a statement from the victim's wife that he normally carried a wallet that was not found

on his body, and a social media post that showed Shegog's girlfriend standing next to the victim's body. The evidence gathered was compiled in an affidavit in support of a search warrant for Shegog's apartment. During the execution of the search warrant, police found a jacket containing the victim's identification as well as other items.

Shegog was arrested and charged, as a persistent misdemeanor offender, with one count of murder in the second degree and one count of armed criminal action.[3] Shegog moved to suppress the knife seized during the exigent circumstances search as well as the evidence seized pursuant to the search warrant. His motion was denied and a two-day jury trial was held. During the trial, Shegog attempted to introduce testimony from a school resource officer assigned to Hickman High School that a student had told him that "they got the wrong person" and "my auntie did it" in apparent reference to this crime. The state's objection to this testimony was sustained by the trial court.[4] The jury found Shegog guilty of murder in the second degree and he was sentenced to thirty years incarceration. Shegog timely appeals.

### Points Raised on Appeal

Shegog raises two points on appeal. In his first point, he argues that the trial

---

2. A "protective sweep" is a search performed "in connection with an in-home arrest [where] an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene." *State v. Rutter*, 93 S.W.3d 714, 725 (Mo. banc 2002) (quoting *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999)). Because no arrest occurred in Shegog's apartment, the search the officers performed would not constitute a protective sweep. However, as explained in detail in this opinion, police may perform a search of a residence without a warrant in the face of defined exigent circumstances. It is clear that while the police used the term protective

sweep, the search was done pursuant to the exigent circumstances exception to the warrant requirement. For the purposes of this appeal, we will refer to the warrantless search of Shegog's apartment as the exigent circumstances search.

3. The armed criminal action count was later dismissed prior to trial.

4. Despite the trial court's ruling sustaining the objection, the defense referred to the student's statements during closing argument without objection by the state.

court erred in overruling his motion to suppress the evidence seized from his apartment during the exigent circumstances search asserting it was obtained as the result of an unlawful search. He further argues that the trial court erred in overruling his motion to suppress the evidence seized during the subsequent search of his apartment pursuant to a search warrant, claiming that the probable cause for issuance of the search warrant was based on evidence improperly seized during the initial exigent circumstances search and any evidence seized pursuant to the search warrant was therefore fruit of the poisonous tree. In his second point, Shegog claims that the trial court erred when it sustained the state's objection to a school resource officer testifying to statements made to him by a student arguing the exclusion of that evidence violated his right to due process of law.

## Standard of Review

"A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." *State v. Lammers*, 479 S.W.3d 624, 630 (Mo. banc 2016). A decision is clearly erroneous "if, after review of the entire record, this Court is left with the definite and firm impression that a mistake has been made." *Id.* We shall defer "to the trial court's factual findings and credibility determinations and consider[ ] all evidence and reasonable inferences in the light most favorable to the trial court's ruling." *Id.* Further, "this court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Carrawell*, 481 S.W.3d 833, 837 (Mo. banc 2016) (quoting *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004)).

A trial court's decision to admit or exclude evidence during a criminal trial is subject to broad discretion "and error occurs only when there is a clear abuse of this discretion.'" *State v. Hartman*, 488 S.W.3d 53, 57 (Mo. banc. 2016) (quoting *State v. Hart*, 404 S.W.3d 232, 248 (Mo. banc 2013)). "A trial court abuses its discretion only if its decision to admit or exclude evidence is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016), (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)). Further, this court reviews claims of trial court error "for prejudice, not mere error." *Id.* (quoting *State v. Clark*, 364 S.W.3d 540, 544 (Mo. banc 2012)). As a result, our court "will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial." *Id.* (quoting *Clark*, 364 S.W.3d at 544).

## Discussion

As a general matter, "warrantless searches and seizures inside a home are presumptively unreasonable and unconstitutional." *State v. Oliver*, 293 S.W.3d 437, 442 (Mo. banc 2009). However, "the state can overcome this presumption by demonstrating that the search or seizure 'falls within one of a carefully defined set of exceptions, many of which are based on the presence of exigent circumstances.'" *State v. Cromer*, 186 S.W.3d 333, 343–44 (Mo. App. W.D. 2005) (quoting *State v. Simmons*, 158 S.W.3d 901, 906 (Mo. App. S.D. 2005)). These "exceptions include pursuing a fleeing felon, preventing the imminent destruction of evidence, preventing a suspect's escape, or mitigating the risk of

danger to law enforcement or other persons inside or outside of the dwelling." *Id.*

An example of an exigent circumstances search is found in the case of *State v. Turner* where a defendant had shot and killed his son on his front lawn. *State v. Turner*, 716 S.W.2d 462, 465 (Mo. App. E.D. 1986). The police performed a warrantless search of the defendant's house after a neighbor informed them that the defendant's daughter had been living with defendant and was unaccounted for at the time of the shooting. *Id.* The court determined that "[t]he officers had a reasonable belief that an additional victim may have been in the house and in need of immediate aid." *Id.* This, the court concluded, "created an emergency situation falling squarely within the exigent circumstances exception to the warrant requirement" thus making the officers' search lawful and the seizure of evidence found in plain view in the home permissible. *Id.*

Similarly, in *State v. Tidwell*, the police responded to a call concerning a body found by the victim's niece in the front yard of the house belonging to the victim's sister. *State v. Tidwell*, 888 S.W.2d 736, 738 (Mo. App. S.D. 1994). The police questioned the victim's sister and then performed a warrantless search of her house after she did not reply when asked if anyone else was inside. *Id.* During the search, the officers found a butcher knife on the kitchen table that was later entered into evidence. *Id.* The court concluded that the facts in the case "constituted exigent circumstances under which [officers] could lawfully enter Defendant's house, without a warrant, to determine whether (a) there were other victims inside needing help, or (b) the killer was inside, a source of potential danger to the officers (and possibly Defendant)." *Id.*

Based on *Turner*, *Tidwell*, and similar cases,[5] we have no difficulty in finding that the trial court did not err in determining that exigent circumstances existed in this case sufficient to justify the initial limited warrantless search of Shegog's apartment. Much like the situation in *Turner*, the police had been informed by a neighbor of the existence of a third party, seen screaming and yelling with Shegog and his girlfriend in the general area of the victim's body, whose whereabouts were unknown. The uncertainty surrounding this third person formed a reasonable basis for officers to perform a search of Shegog's apartment in order to ensure that there was not an additional victim in need of aid or a potential third party who may have been either a perpetrator or possible accessory engaged in the destruction of evidence. While in the course of performing this exigent circumstances search, the officers discovered a knife, with what appeared to be blood on it, lying in plain view on the kitchen counter. It is well established that once an officer has made a lawful entry into a home, they are permitted to seize any evidence in plain view. *Turner*, 716 S.W.2d at 465; *State v. Rutter*, 93 S.W.3d 714, 724 (Mo. banc 2002); *State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App. W.D. 2005). Because the officers were

---

5. *See, e.g., State v. Burnett*, 230 S.W.3d 15 (Mo. App. W.D. 2007) (Police investigating whereabouts of child permitted to enter residence of natural parent, whose rights had been terminated, on the basis of exigent circumstances after being informed that natural parent was the last to be seen with child, adult occupants of residence refused to answer the door, and a different child sent to answer the door was evasive and showed evidence of being coached); *State v. Orso*, 789 S.W.2d 177 (Mo. App. E.D. 1990) (Police entry into a home shared by victim and her grandson permitted under exigent circumstances exception as relatives of victim had been unable to make contact and grandson provided evasive and inconsistent statements to police).

justified in performing the warrantless search of Shegog's apartment, the discovery and seizure of the knife was lawful, and it was not error for the trial court to deny Shegog's motion to suppress this evidence.

■■■■ Shegog's next argument concerns the evidence seized during the subsequent execution of the search warrant. The success of this argument necessarily depends upon the previously discussed exigent circumstances search being found invalid. Shegog argues that because the probable cause affidavit filed in support of the search warrant included the knife found during the initial search, which he maintains was unlawful, the search warrant itself was tainted and any evidence found during the execution of the search warrant constitutes fruit of the poisonous tree and is equally inadmissible.[6] Because we hold that the trial court did not err in denying the motion to suppress the knife, Shegog's argument concerning the fruit of the poisonous tree doctrine must fail. As the knife was properly seized during a lawful search, the search warrant obtained thereafter, relying in part on the knife, suffers no infirmity, and the evidence seized during its execution was admissible.

■■■■ Even if this court were to find that the exigent circumstances search performed by the officers was unlawful, which we do not, there would still have been no error committed in denying the motion to suppress the evidence seized during the execution of the search warrant on Shegog's apartment. The mere fact "that illegally obtained evidence is included in the affidavit [for a warrant] does not invalidate the warrant." *State v. Oliver*, 293 S.W.3d 437, 443 (Mo. banc 2009). "The ultimate inquiry 'is not whether the affidavit contained allegations based upon illegally obtained evidence but whether, if setting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.'" *Id.* (quoting *State v. Mahsman*, 157 S.W.3d 245, 251 (Mo. App. E.D. 2004)). Probable cause for the issuance of a search warrant exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Neher*, 213 S.W.3d 44, 49 (Mo. banc 2007). We find that the information contained in the affidavit in support of the search warrant, considered in its totality, would have been sufficient, even absent the inclusion of the knife,[7] to establish probable cause for issuance of the search warrant for She-

---

**6.** "The fruit of the poisonous tree" refers to evidence that is determined to be derived from an unlawful search. *State v. Grayson*, 336 S.W.3d 138, 146 (Mo. banc 2011). Generally, all evidence obtained by unreasonable and otherwise unlawful searches and seizures is inadmissible under the exclusionary rule. *Id.* "Application of this exclusionary rule extends beyond the direct product of [an unlawful search]" and includes the so called "'fruit of the poisonous tree" which is itself a derivative product of the unlawful search. *Id.* at 146–47.

**7.** Excluding the knife found during the exigent circumstances sweep, the evidence in the search warrant affidavit included the following facts: the body was found in the yard adjacent to the apartment building, local se-

curity footage showed what appeared to be the victim exiting the apartment building by the small wooden exterior staircase that led from Shegog's apartment along with several other individuals, dried blood was found on a doorframe that connected the same staircase to Shegog's apartment, Shegog and his girlfriend admitted that the apartment was their residence, Shegog's girlfriend admitted she knew the victim had been stabbed which police believed was impossible to know without examining the body, the victim's wife informed police that he normally carried a wallet though none was found on the body, and officers had located a video posted to social media that showed Shegog's girlfriend standing next to the body prior to police arrival.

gog's apartment.[8] Appellant's first point is denied.

Shegog's second point on appeal is directed at the trial court's ruling preventing a school resource officer from testifying to statements made to him by a student that "they got the wrong person" and "my auntie did it." A defendant may introduce evidence that another person committed a crime "if a proper foundation is laid" and the probative value of the evidence is not "substantially outweighed by its costs (such as undue delay, prejudice or confusion)." *State v. Bowman*, 337 S.W.3d 679, 686 (Mo. banc 2011) (quoting *State v. Barriner*, 111 S.W.3d 396, 400 (Mo. banc 2003)). "[E]vidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." *State v. Nash*, 339 S.W.3d 500, 513 (Mo. banc 2011) (quoting *State v. Rousan*, 961 S.W.2d 831, 848 (Mo. banc 1998)). Rather, evidence of an alternative perpetrator is admissible only if there is proof that the other person committed *some act* directly connecting that person with the crime. *State v. Speaks*, 298 S.W.3d 70, 86 (Mo. App. E.D. 2009); *see also State v. Davidson*, 982 S.W.2d 238, 242 (Mo. banc 1998). The defendant must establish "a clear link" between the alleged alternative perpetrator and "the corpus delicti of the crime." *State v. McKay*, 459 S.W.3d 450, 458 (Mo. App. E.D. 2014); *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 249–250 (Mo. App. W.D. 2011). Here, the excluded testimony is precisely the type prohibited by *Nash*, evidence that at best does nothing but cast bare suspicion or raise conjectural inferences.[9] Moreover, because the excluded evidence consisted merely of out-of-court statements offered to prove the truth of the matter asserted, it would constitute inadmissible hearsay.[10] *State v.*

---

8. Further, because the knife discovered during the exigent circumstances search was found in plain view, we may assume that it would have been inevitably discovered during the execution of the warrant. Under the inevitable discovery doctrine, evidence found during an otherwise unlawful search is admissible "if law enforcement personnel would have ultimately or inevitably discovered the evidence." *State v. Oliver*, 293 S.W.3d 437, 443 (Mo. banc 2009). In order "[t]o show that the evidence would have inevitably been discovered, the state must prove by a preponderance of the evidence: (1) that certain standard, proper and predictable procedures of the local police department would have been utilized and (2) those procedures inevitably would have led to discovery of the challenged evidence through the state's pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* At the motion to suppress hearing, officers testified that they followed their standard procedures during the investigation, namely securing the apartment and preventing anyone from entering the premise until the search warrant was secured and executed. As already stated, we find that the evidence discovered in pursu-

ance of lines of investigation other than the exigent circumstances search was sufficient to establish probable cause for a warrant and we find that the warrant would have inevitably led to the discovery of the knife, which was lying in plain view. Consequently, even if we were to have found that the exigent circumstances search was unlawful, the knife would have nevertheless been admissible.

9. The speculative nature of the excluded testimony was made clear during the defense's offer of proof, which established that the student's statements that "they got the wrong person" and "my auntie did it" constituted the entirety of the evidence on this subject. The offer of proof did not include the identity of the referenced aunt or any additional details establishing a connection of the aunt to the charged crime. In short, the statements the defense sought to elicit constituted nothing more than an assertion that some other unidentified individual was the perpetrator, the kind of testimony that is not permitted under the holding of *Nash*.

10. Defense counsel argued to the trial court that the testimony was not offered for its truth

*Hartman,* 488 S.W.3d 53, 57 (Mo. banc 2016). As a result of the foregoing, the trial court did not abuse its discretion in excluding the school resource officer's testimony regarding the student's statements. Shegog's second point on appeal is denied.

### Conclusion

The Judgment of the trial court is affirmed.

All concur.

but rather to show that law enforcement didn't follow up on the information. To the extent this was the purpose of the offered statements, we note that, despite the trial court sustaining the prosecution's objection to the specific statements made by the student, defense counsel was still permitted to question the school resource officer regarding the fact that he had received information from a student, that he had passed that information along, and that he was not aware what actions were taken regarding that information. The only limitation placed on the school resource officer's testimony was the specific content of the statements made by the student.