

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED107356 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | |
| VICTOR C. WHITTIER, | ) | Honorable Thomas C. Clark II |
| | ) | |
| Defendant/Appellant. | ) | Filed: October 1, 2019 |

## Introduction

Victor C. Whittier (Appellant) appeals from the trial court's judgment entered after a jury

trial convicting him of first-degree murder. We affirm.

## Facts and Background

Appellant was convicted of murdering his estranged girlfriend (Victim) by shooting her

from outside of her window at night. Victim was in her apartment she shared with her younger

brother, Reggie Jackson (Reggie), who was 13 years old at the time of his sister's shooting. On

the evening Victim was shot, Reggie was in the living room playing video games. Reggie

testified he heard Appellant yell "F--- you" followed by gunshots. Reggie testified he was

familiar with the sound of gunshots in their neighborhood, and usually when he heard them his

sister would yell for him to get down. That night, Reggie did not hear his sister yell, so he went

to her room to check on her. Reggie entered his sister's room and saw blood everywhere, and

then ran from their apartment to a neighbor's house.

Emergency services responded, finding Victim dead at the scene. She had been shot four times from outside the apartment; it was not clear how many shots had been fired in total.

Police interviewed Reggie at the scene. Reggie recounted what he had observed. He told police Victim had a restraining order against Appellant, who was the individual he heard yell before Victim was shot.

Police accessed security camera footage from the apartment complex. The footage depicted a male subject pacing around the complex shortly before the shooting. The subject was wearing a dark shirt and jeans with distinctive tearing and bleach marks. The shooting itself was not shown, but the individual stalked the area outside of Victim's window sometime before the shooting, and then suddenly ran away.

Investigators spoke with a neighbor who had witnessed an individual walking around the apartment complex that night. The neighbor recognized the individual as a man who been at the complex on numerous occasions, and who drove a noisy car with engine troubles. While dating Victim, Appellant had been to the apartment complex numerous times. At trial, Reggie testified about Appellant's battered car with noisy engine troubles.

Police obtained the restraining order Victim had recently obtained against Appellant from Victim's apartment. Investigation led police to a residence in St. Louis where Appellant had been staying. A vehicle connected with Appellant was located outside the residence. Inside the residence police found a box containing Appellant's belongings, including his driver's license. In the closet of a bedroom occupied by another individual, police found a .38 caliber revolver with five spent shell casings. An examination of the revolver could not conclusively determine whether the bullets that killed Victim were fired from it, nor could fingerprints be identified. However, examiners were able to conclude the revolver was the same caliber as the murder

weapon. Examiners also concluded the revolver had the same eight-right barrel rifling that would produce the same type of lands and grooves as were found on the slugs fired into Victim's apartment. Appellant was arrested wearing clothes similar to the subject depicted in the surveillance footage.

Additional facts will be adduced as necessary.

## Points on Appeal

Appellant brings three points in this appeal. Point I claims the trial court erred by excluding evidence of an alternative suspect. Point II claims the trial court erred by admitting into evidence the security camera footage from the apartment without a proper foundation. Point III claims the trial court erred by admitting into evidence the revolver found in the closet at the residence where Appellant was staying.

## Point I

At trial, Appellant sought to introduce evidence that Nelson Hall, Jr. (Hall), an individual Victim had dated before Appellant, was the actual shooter. The State of Missouri (State) filed a motion in limine to exclude such evidence. At a pretrial hearing on the State's motion in limine, Appellant told the trial court he wished to introduce evidence of a number of violent incidents between Victim and Hall, including one incident where Hall brandished a gun and punched a hole in Victim's wall. Appellant also stated he wished to elicit testimony from Reggie that Hall continued to appear at Victim's and his apartment after Hall and Victim broke up, including one instance where Reggie saw Hall lingering outside their window. The State argued there was no evidence placing Hall at the scene of the shooting that night, and all the other evidence was thus inadmissible. When the trial court asked whether Appellant had any evidence directly

3

connecting Hall to the shooting, Appellant stated he did not. The trial court ruled evidence regarding Hall as an alternative suspect was inadmissible.

At the conclusion of Reggie's testimony, Appellant made an offer of proof consisting of testimony from Reggie regarding Hall. At the end of the offer of proof, Appellant asked Reggie whether the voice he heard yell "F--- you" the night his sister was shot could have been Hall's, and Reggie replied, "Maybe."

*Standard of Review*

"The trial court is vested with broad discretion to exclude or admit evidence at trial." State v. Wright, 551 S.W.3d 608, 616 (Mo. App. E.D. 2018), citing State v. Bowman, 337 S.W.3d 679, 686 (Mo. banc 2011). "We review the trial court's evidentiary rulings for an abuse of that broad discretion." Id. An abuse of discretion occurs when the trial court's decision is so against the logic of the circumstances then before it, or so unreasonable and arbitrary, that it shocks one's sense of justice and indicates a lack of careful consideration. State v. Shegog, 521 S.W.3d 628, 633 (Mo. App. W.D. 2017). We reverse on such a basis only when an appellant establishes both error and resulting prejudice. Id.

*Discussion*

Appellant claims the evidence he offered to the trial court was sufficient under Missouri law to entitle him to present to the jury as evidence of an alternative suspect.

"Generally a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by its costs (such as undue delay, prejudice or confusion)." State v. Barriner, 111 S.W.3d 396, 400 (Mo. banc 2003). Missouri courts have been consistent in holding evidence showing another person had a motive or an opportunity to commit the crime is

4

not admissible to cast a bare suspicion on another person.  State v. Speaks, 298 S.W.3d 70, 86 (Mo. App. E.D. 2009), citing State v. Woodworth, 941 S.W.2d 679, 690 (Mo. App. W.D. 1997).  Such evidence may be admissible, provided the defendant can satisfy the so-called "direct connection rule."  State v. McKay, 459 S.W.3d 450, 458 (Mo. App. E.D. 2014).  In order to satisfy this rule, "[t]he evidence must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides [the defendant] as the guilty person."  Speaks, 298 S.W.3d at 86.

We find the evidence referred to in the State's motion in limine, and during the pretrial hearing on the same, was properly classified by the trial court as inadmissible evidence of a possible motive and opportunity for Hall to have committed the shooting.  Appellant wished to introduce Reggie's testimony that Hall was violent towards Victim in the past, possessed a gun, and continued to stalk Victim after they broke up.  None of this evidence directly connects Hall with the shooting.  Appellant conceded as much when he told the trial court he had no evidence placing Hall at Victim's apartment that night.  Without evidence directly connecting Hall to the shooting itself, evidence he was violent towards Victim in the past, threatened her, or was otherwise abusive and hostile is precisely the sort of evidence Missouri courts consider inadmissible.  See Helmig v. State, 42 S.W.3d 658, 671-72 (Mo. App. E.D. 2001); State v. Stokes, 638 S.W.2d 715, 723 (Mo. banc 1982).

On appeal, Appellant argues his evidence met the "direct connection" threshold because during his offer of proof, when Reggie was asked whether the voice he heard may have been Hall's, Reggie responded, "Maybe."  This "maybe," standing alone, is insufficient to meet Appellant's burden of producing evidence that "tends clearly to point out someone besides [the defendant] as the guilty person."  Speaks, 298 S.W.3d at 82, quoting Woodworth, 941 S.W.2d at

5

690.  Reggie had consistently identified Appellant as the individual whom he heard yell before Victim was shot.  Appellant cannot point to any other evidence to show a direct connection between Hall and Victim's murder.  Bereft of any further context, Reggie's one ambiguous answer during the offer of proof does not clearly connect Hall to the shooting, and can at most serve to cast on him bare suspicion.

Appellant argues this case is similar to State v. McKay, where this Court reversed the trial court based on its exclusion of several substantial pieces of evidence that directly connected an alternative suspect to the commission of the offense.  459 S.W.3d at 459-60.  We find this case bears a stronger resemblance to State v. Bowens, 550 S.W.3d 84 (Mo. App. E.D. 2018).  There, the appellant also attempted to invoke McKay, arguing the trial court's exclusion of evidence of several other robberies committed by an individual wearing the same Chicago Bulls cap worn by the appellant during the commission of his offense was error.  Id. at 99-100.  The appellant argued the direct connection rule was satisfied by the perpetrators wearing similar hats.  Id.  This Court disagreed, holding that, unlike the clear and substantial evidence discussed in McKay, the hat connection "does not tend to clearly point to [the alternative suspect] as the guilty person in this case.  At most, the evidence only raises a bare suspicion or conjectural inference that another person committed the crimes...."  Id. at 100.

From Bowen's holding, we take the principle that the direct connection rule cannot be satisfied on evidence so lacking in probative value it is outweighed by its potential to confuse and mislead the trier of fact.  See also State v. Harding, 528 S.W.3d 362, 377-78 (Mo. App. E.D. 2017) (offered evidence "must establish a *clear link* between the alleged alternative perpetrator and a key piece of evidence in the crime") (emphasis added).  Bereft of context, Reggie's monosyllabic response during the offer of proof does not meaningfully put at issue whether Hall

6

was involved with Victim's shooting, nor does it justify giving Appellant an unfettered opportunity to introduce evidence that is otherwise inadmissible. In so holding, we are also mindful of the substantial evidence of Appellant's guilt, which includes two witnesses recognizing his voice and his car, his possession of clothes similar to the clothes worn by the assailant on security camera, and the fact a weapon of the same type used to kill Victim was found where Appellant was staying. In light of the record as a whole, we cannot conclude the exclusion of Reggie's "maybe" had an outcome determinative effect. Nor did that "maybe" justify allowing Appellant to dredge up another unfortunate past relationship of Victim's, and create a substantial risk the jury would be confused, misled, and unduly prejudiced. See McKay, 459 S.W.3d at 459-60 (showing prejudice requires error to have had reasonable probability of affecting outcome). Accordingly, Appellant's first point is denied.

## Point II

In his second point, Appellant claims the trial court plainly erred by admitting security camera footage for which the State failed to lay a proper foundation.

At trial, the State sought to admit the security camera footage obtained from Victim's apartment's surveillance system. The footage depicted the individual that the State argued was Appellant as he stalked about the apartment's exterior before pausing outside of Victim's window for some time, then suddenly running away.

At trial, the footage was introduced through one of the investigating police officers. The officer testified he was able to remotely access the apartment complex's security footage due to having accessed it for a prior investigation. The officer stated he was familiar with the security camera system, had used it before, and based on his experience the footage was of above-average quality. After observing the footage, the officer requested and received a copy. When the State

7

sought to admit this footage into evidence, Appellant objected, stating he believed the proper foundation had not been laid because the officer could not testify as to his personal knowledge of whether the footage depicted a fair and accurate representation of what occurred. The trial court overruled Appellant's objection and the footage was admitted.

*Standard of Review*

Appellant objected to the introduction of the footage at trial, but did not include the claim in his motion for new trial. Appellant concedes he has not preserved this issue for appellate review. Rule 29.11(d).[1] Thus, this claim may only be reviewed for plain error.

"Plain error is a two-step process." State v. Speed, 551 S.W.3d 94, 98 (Mo. App. W.D. 2018), citing State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009).

> First, we determine whether the trial court committed evident, obvious and clear error affecting the defendant's substantial rights. If the defendant does not get past the first step, our inquiry ends. If we determine that a plain error occurred, however, we then must decide whether the error actually resulted in manifest injustice or a miscarriage of justice.

State v. Smith, 370 S.W.3d 891, 894 (Mo. App. E.D. 2012).

"The trial court is vested with broad discretion to exclude or admit evidence at trial." Wright, 551 S.W.3d at 616, citing Bowman, 337 S.W.3d at 686. "We review the trial court's evidentiary rulings for an abuse of that broad discretion." Id. An abuse of discretion occurs when the trial court's decision is so against the logic of the circumstances then before it, or so unreasonable and arbitrary, that it shocks one's sense of justice and indicates a lack of careful consideration. Shegog, 521 S.W.3d at 633. We reverse on such a basis only when an appellant establishes both error and resulting prejudice. Id.

---

[1] Mo. R. Crim. P. 2018.

*Discussion*

The State argues sufficient foundation was laid for the video under State v. Moyle, 532 S.W.3d 733 (Mo. App. W.D. 2017). Moyle involved a defendant on trial for attempting to return items she had not purchased to a store. Id. at 735. The State sought to introduce surveillance footage of the defendant taking items from a store shelf and then proceeding directly to the return desk to obtain a fraudulent refund. Id. The defendant objected because the State had no witness to testify as to their own firsthand knowledge that the footage was a fair and accurate representation of what it depicted. Id. at 736. The trial court overruled the objection and the footage was admitted. Id. at 735. On appeal, the Western District affirmed the trial court's ruling under the so-called "silent witness" theory. Id. at 738. Under this theory of authentication, the routinely collected security camera footage was admissible evidence of an event's occurrence even though no witness could verify its accuracy from firsthand knowledge. Id. at 737. The theory is so named because under it the footage itself is treated as a proxy witness of the event it depicts. Id. If the camera and security system used to capture the footage displayed sufficient indicia of reliability, the footage should be admissible to prove the occurrence of the event it depicts. Id.

In Moyle, the Western District set forth its view on what factors trial courts should consider when evaluating the reliability of the surveillance footage evidence. The non-exhaustive list includes: (1) whether the camera, recording system and storage method were working properly at the time of the event depicted; (2) the historic reliability of the system including whether it was sufficiently protected from tampering by third parties; and (3) whether the recording in the medium presented at trial is a fair and accurate portrayal of the recording in its original form, or that any modification is sufficiently explained and does not affect the

9

reliability or accuracy of the evidence.  Id. at 738.  The Moyle court noted its list was not meant to be comprehensive, and, depending on the circumstances, the trial court may conduct additional inquiry to ensure the system is sufficiently reliable.  Id.

On appeal, Appellant claims the State met none of its foundational burdens under Moyle. We disagree.  The foundation was sufficient to show the camera was working properly, as the officer testified he was familiar with the system, had used it in the past, had utilized it in the instant case without any indication of malfunction, and in his experience it was of above-average quality.  As to the third factor, the officer also testified he had accessed the feed from the camera system near the time of the shooting, had later requested a copy of that footage, and that the copy matched his initial observation of the feed.

If the State's foundation was lacking in any respect, it was with regard to the second factor.  The State argues the foundation was sufficient to show historic reliability because the officer testified he had utilized that same camera system for a prior investigation.  This may be sufficient to establish a general historic reliability, but the Moyle factor includes a more specific inquiry: whether the system is protected from third-party tampering.  As far as we can tell, the State laid no foundation to show whether the surveillance system itself was sufficiently protected from third-party tampering.

However, this deficiency does not rise to the level of plain error.  Notably, Appellant does not argue the video footage may have been tampered with, or was readily available to be tampered with.  Nor does Appellant argue the State would have been unable to establish the system was sufficiently protected from tampering.  Rather, he points only to the lack of foundation on the record establishing such protections.  Even if we were to agree the trial court erred by accepting the footage without such assurance by the State, Appellant would still have

the burden of establishing he was prejudiced. Shegog, 521 S.W.3d at 633. Without any suggestion the State would have been unable to lay a proper foundation for the footage, it is questionable whether Appellant can establish any resulting prejudice, much less the higher burden he now bears of showing a manifest injustice resulted. See Kulhanek v. State, 560 S.W.3d 94, 104 (Mo. App. E.D. 2018) (no prejudice results from admitting evidence without foundation where appellant cannot argue State was actually unable to lay foundation).

In the instant case, the surveillance footage was highly probative and otherwise displayed strong indicia of reliability. Further, as the Moyle court points out, the traditional rules governing the admission of video evidence are too restrictive and illogical to apply in the instant case, as they may have resulted in the exclusion of video evidence that was useful to the jury in evaluating the State's case against Appellant. However, Moyle should not serve as a license for the unrestricted admission of such footage without the prerequisite inquiries prescribed by the Moyle court. Here, the trial court admitted the security camera footage into evidence without assurances from the State the system was historically reliable with regard to its protections from third-party tampering. However, given the standard of review, Appellant is unable to establish this amounts to plain error. After considering the entire record, including the footage's other strong indicia of reliability and the substantial evidence of Appellant's guilt, we find neither a manifest injustice nor a miscarriage of justice occurred.

Appellant's Point II is denied.

## Point III

Appellant next claims the trial court abused its discretion by allowing the State to enter into evidence the revolver found in the closet at the residence where Appellant was staying. He argues the evidence was not logically or legally relevant because the revolver was found in the

11

closet of a room occupied by another individual, and the State was unable to establish the revolver was the same one used to shoot Victim.

*Standard of Review*

"The trial court is vested with broad discretion to exclude or admit evidence at trial." Wright, 551 S.W.3d at 616, citing Bowman, 337 S.W.3d at 686. "We review the trial court's evidentiary rulings for an abuse of that broad discretion." Id. An abuse of discretion occurs when the trial court's decision is so against the logic of the circumstances then before it, or so unreasonable and arbitrary, that it shocks one's sense of justice and indicates a lack of careful consideration. Shegog, 521 S.W.3d at 633. We reverse on such a basis only when an appellant establishes both error and resulting prejudice. Id.

*Discussion*

"Evidence of weapons not connected to the accused or the offense at issue are generally inadmissible." State v. Wood, --- S.W.3d ---, 2019 WL 3144027 (Mo. banc July 16, 2019), citing State v. Hosier, 454 S.W.3d 883, 895 (Mo. banc 2015).

> [E]vidence is relevant to show that the accused owned, possessed or had access to tools, implements, or any articles with which the particular crime was or might have been committed, and that he owned or had such weapons in his possession prior to or shortly after the commission of the crime.

State v. Miller, 208 S.W.3d 284, 287 (Mo. App. W.D. 2006), quoting State v. Stancliff, 467 S.W.2d 26, 30 (Mo. 1971).

In order to be admissible, evidence must be both logically and legally relevant. Id. Logical relevance means it makes a material fact more or less likely. Id. Legal relevance means its probative value must outweigh its potential to cause undue prejudice, by misleading or inflaming the passions of the jury. Id.

12

We hold the revolver was both logically and legally relevant. The revolver's logical relevance was established because the State showed it was the same caliber as the murder weapon, with the same eight-right barrel that would produce a pattern of lands and grooves similar to the ones found on the bullets used to shoot Victim. The spent shell casings in the revolver corresponded to the approximate number of shots that had been fired into Victim's apartment. Additionally, the revolver was found at a residence where Appellant was staying. This tends to make more likely the fact that Appellant had access to the weapon that may have killed Victim. The revolver was thus connected to both Appellant and the crime, making it relevant and highly probative of Appellant's guilt. Speaks, 298 S.W.3d at 81.

Appellant argues the State cannot tie the revolver to him sufficiently to establish logical relevance, citing State v. McCauley, 528 S.W.3d 421 (Mo. App. E.D. 2017). McCauley involved a defendant who had been acquitted notwithstanding a guilty verdict of being a felon in possession of a firearm. The State appealed the trial court's granting the defendant's motion for acquittal. On appeal, this Court held the trial court's judgment was proper where the State failed to prove beyond a reasonable doubt the defendant knowingly possessed the firearm found concealed in a kitchen drawer in a shared apartment. McCauley is largely unhelpful to Appellant, because the standard for establishing logical relevance and the standard for convicting someone of illegally possessing an item, which is proof beyond a reasonable doubt they knowingly possessed it, are substantially different. See State v. Prince, 534 S.W.3d 813, 819 (Mo. banc 2017) ("Determining whether evidence is logically relevant is a very low-level test that is easily met.") (citation and internal quotation marks omitted).

Appellant also argues the revolver's probative value was outweighed by its tendency to unfairly prejudice the jury against him, but he does not identify any such unfair prejudice.

13

Appellant claims the revolver unfairly prejudiced him by allowing the State to argue the revolver tied Appellant to the offense. This argument begs the question, as it presumes the probative value of the evidence and the unfairly prejudicial effect are one and the same. But it is insufficient to merely show the damning evidence was prejudicial; any evidence that establishes a defendant's guilt necessarily prejudices him. State v. Rush, 949 S.W.2d 251, 256 (Mo. App. S.D. 1997). Appellant must establish such prejudice is *unfair*, and outweighs the evidence's probative value. Appellant has failed to do so.

Of all the cases cited by Appellant, none supports his claim that where, as here, the State establishes a clear link between the crime, the evidence, and the defendant, the evidence must nonetheless be excluded. Appellant's Point III is denied.

<u>Conclusion</u>

The judgment of the trial court is affirmed.

_____
SHERRI B. SULLIVAN, J.

Mary K. Hoff, P.J., and
Angela T. Quigless, J., concur.

14