

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | )   **WD84601** |
| Respondent, | ) |
| | )   **OPINION FILED:** |
| v. | ) |
| | )   **December 6, 2022** |
| JOSE F. HERNANDEZ, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Kenneth R. Garrett, III, Judge**

**Before Division Two:**
**Lisa White Hardwick, P.J., Thomas N. Chapman and Janet Sutton, JJ.**

Jose Hernandez (Hernandez) appeals his convictions of first-degree domestic assault under section 565.072, armed criminal action under section 571.015, felonious restraint under section 565.120, and second-degree domestic assault under section 565.073.[1] Hernandez claims the Jackson County Circuit Court (the court) erred in overruling his motion to suppress evidence seized during the search of his home on October 6, 2016. Because we find no error, the court's judgment is affirmed.

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2015 noncumulative supplement, unless otherwise noted.

## Factual and Procedural Background[2]

The sufficiency of the evidence is not in dispute. In June 2016, A.V. (Victim) ended her relationship with Hernandez, a former coworker whom she dated for approximately a year. About four months into the relationship, Hernandez became physically aggressive. Victim broke up with Hernandez following several violent incidents.

First, in March, Hernandez held a knife to Victim's throat, took her cell phone, purse, cigarettes, and other belongings, and strangled Victim while holding her in a bedroom. Second, in June, Hernandez tailed Victim in a car trying to cut her off, resulting in Victim running a red light and Hernandez blocking her in a parking lot to prevent her escape. While attempting to "hop the curb" to flee, Victim backed into a pole. As Victim tried to flee, Hernandez approached her car and tried to open the car door and get in.

Yet another time, Victim met Hernandez in his driveway to talk and then Hernandez persuaded her to come inside the home. Once inside, however, Hernandez tried to get physical control of Victim. Victim started screaming, and Hernandez put his fingers in her mouth to quiet her. Hernandez's stepfather soon found them and told Hernandez to let Victim go. Once Hernandez let go, Victim ran to her car and left.

After Victim broke off the relationship, Hernandez continued texting Victim, with Victim only responding to keep Hernandez happy. Victim also unsuccessfully tried to get an order of protection against Hernandez, but the order was never served

---

[2] "The facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Rutter*, 93 S.W.3d 714, 720 (Mo. banc 2002).

on Hernandez.

On October 5, 2016, Victim left work, met a friend, went to a local hockey game, and then the two hung out at a bar. After, Victim drove home in the early morning hours of October 6, and she stopped at a convenience store. She then texted friends, attempting to get a ride and some marijuana. Victim went inside the store to purchase cigarettes then came back out to her car. Hernandez pulled into the parking lot. Hernandez asked Victim what she was doing and Victim told him she was looking for marijuana. Hernandez told Victim that if she would follow him back to his house, he knew where to get some marijuana. Victim agreed and followed Hernandez back to his home in Blue Springs, Missouri (the residence). When Victim arrived at Hernandez's home, Victim asked to go inside to use the bathroom. Once Victim exited the bathroom, Hernandez said, "I don't have $20 for you, bitch, so this isn't gonna go how you think it is."

Hernandez began punching Victim's face. Hernandez then slammed Victim into the ground, pulled out a gun, and hit Victim's head with the gun. Hernandez picked up Victim, forced her into his bedroom, tied her hands behind her back, belted her feet together, and shoved a scarf into her mouth. Hernandez then left to grab Victim's purse, cell phone, and tablet from her truck.

While Hernandez was gone, Victim freed her feet and attempted to escape but ran into Hernandez's mother. Hernandez returned and pointed a gun at both Victim and his mother as Victim pled with his mother for help. Hernandez and his mother argued but she eventually went back up the stairs in the house.

While still pointing the gun at the Victim, Hernandez forced her outside and into

3

the passenger seat of her truck. Hernandez climbed over her to the driver's seat and then reached over, shutting her door. Once in the truck, Victim told Hernandez she gave him the keys already. While Hernandez looked for the truck keys, Victim managed to open the truck door. As Victim turned around to exit the truck, Hernandez fired the first gunshot at her. Victim got out and ran down the street. Hernandez chased her, continuing to shoot at Victim. Victim then fell and pretended to be dead. Hernandez ran off and Victim used a cell phone in her pocket to call 911.

Patrol Sergeant Colby Lalli was dispatched to the area of 2820 Southeast 6th Street on a shots-fired call. He searched for Victim whose exact whereabouts were unknown. Canvassing the area, Sergeant Lalli soon found Victim laying in a nearby driveway. With blood all over her, Victim lay motionless in a pool of blood with her hands tied. Sergeant Lalli asked Victim, "Who did this to you?" and "Who shot you?" to which Victim responded, "Jose." Emergency responders transported Victim to a nearby hospital for care. Victim was treated for two gunshot wounds, a collapsed lung, and various lacerations.

Police canvassed the nearby residences to locate from where the shots were fired. Two neighbors living across the street reported hearing arguing coming from the house, between four to six gunshots, and then a voice scream "Jose" five times coming from the residence's direction. One neighbor also saw Hernandez in the street walking "across the corner of the grass and into the [home's] driveway" after the shooting. Another neighbor saw Hernandez standing in the street outside his home after the shooting before getting into a red car and driving away. The neighbors directed police to the residence as the place where they heard gunshots, telling officers that Hernandez

4

lived there.

Hernandez's brother testified he heard the gunshots while walking back to the residence after a night with friends. After hearing the shots, the brother fled, later returning to the residence and telling police he had heard his brother, Hernandez, and Victim arguing inside the house.

At the time, other occupants of the residence included Hernandez's mother, stepfather, and brother. The record, however, is unclear as to where Hernandez's stepfather was located following the shooting. Sergeant Lalli reported that Hernandez's mother "had said I believe her husband was still in the house" while Officer Brian Lankard stated that both the mother and stepfather "came out on their own." So too is the record unclear on when Hernandez's brother returned to the residence that night after the shooting.[3]

Hernandez's whereabouts remained unknown. Police decided to perform a protective sweep of the residence to look for any additional victims and suspect Hernandez. During the protective sweep, police saw blood in Hernandez's bedroom, but did not find anyone else in the residence. Police exited, secured the residence, and obtained a search warrant to search the house for evidence, which they then executed. The search warrant authorized police to take photographs and collect trace evidence including hair, fibers, fingerprints, DNA evidence, clothing, and weapons. Pursuant to the warrant, police "recovered various items of evidence from the defendant's bedroom

---

[3] The State asked Officer Lankard "Before the protective sweep, had you contacted the [brother]?" to which Officer Lankard responded, "I had spoke [sic] with him, yes." Officer Lankard, however, did not state *when* he spoke with the brother. Neither did the brother testify at what point he returned to the residence and spoke with police, saying only that he spoke with them "[w]hen I got there to the scene . . . ."

5

room including blood and items stained with blood which belongs to the victim in this matter together with drug paraphernalia[]" and took photographs inside the residence.[4]

The State charged Hernandez with first-degree domestic assault, armed criminal action, felonious restraint, and second-degree domestic assault. Hernandez moved to suppress "all items of evidence recovered on October 6, 2016," seized pursuant to the search warrant following the "warrantless protective search." After pretrial hearing, the court denied Hernandez's motion, and granted Hernandez's counsel a continuing objection.

In June 2021, a Jackson County jury found Hernandez guilty on all four counts. The court sentenced Hernandez to thirty years on the first-degree domestic assault count, thirty years on the armed criminal action count, fifteen years on the felonious restraint count, and fifteen years on the second-degree domestic assault count, with all sentences to run concurrently. Hernandez appeals, contending the court erred in denying his motion to suppress evidence and in overruling his objection to the admission of "that evidence" at trial.

## Standard of Review

"A trial court's ruling on a motion to suppress will be reversed on appeal only if it is clearly erroneous." *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007); *State v. Lammers*, 479 S.W.3d 624, 630 (Mo. banc 2016). "The trial court's ruling will be deemed clearly erroneous if, after review of the entire record, this Court is left with the definite and firm impression that a mistake has been made." *Lammers*, 479 S.W.3d at

---

[4] This information about what police found in the residence pursuant to the warrant comes from Hernandez's motion to suppress, as the search warrant return was not included in the legal file.

6

630.

"This Court defers to the trial court's factual findings and credibility determinations and considers all evidence and reasonable inferences in the light most favorable to the trial court's ruling." *Id.* "Further, 'this [C]ourt considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling.'" *State v. Shegog*, 521 S.W.3d 628, 633 (Mo. App. W.D. 2017) (quoting *State v. Carrawell*, 481 S.W.3d 833, 837 (Mo. banc 2016)); *see State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App. W.D. 2005).

"While 'a trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous,' a determination as to whether conduct violates the Fourth Amendment is an issue of law that this Court reviews *de novo*." *State v. Waldrup*, 331 S.W.3d 668, 672 (Mo. banc 2011) (quoting *Sund*, 215 S.W.3d at 723); *State v. Smith*, 620 S.W.3d 120, 123 (Mo. App. W.D. 2021).

## Legal Analysis

Before we address the merits of Hernandez's claim, we address the nature of his point relied on. "A point relied on is multifarious if it groups together multiple, independent claims rather than a single claim of error." *Cityview Real Est. Servs., LLC v. K.C. Auto Panel, Inc.*, 576 S.W.3d 187, 191 (Mo. App. W.D. 2019) (citation omitted). "Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review." *Id*. (citation omitted); *Lexow v. Boeing Co.*, 643 S.W.3d 501, 507 (Mo. banc 2022) ("A multifarious point relied on preserves nothing for review."). "However, we prefer to decide cases on the merits where we can readily discern and separate the independent claims of error in the point relied on, and so we exercise our

discretion to address the merits of each claim which is in fact contained in the point relied on." *Janet v. Janet*, 638 S.W.3d 570, 577 (Mo. App. W.D. 2021); *see also City of Aurora v. Spectra Commc'ns Grp., LLC*, 592 S.W.3d 764, 795 n.20 (Mo. banc 2019) ("This Court, however, has discretion to review, *ex gratia*, multifarious points on the merits . . . .").

> Hernandez's point on appeal is impermissibly multifarious in that he asserts:
>
> The trial court erred in denying Jose Hernandez's motion to suppress evidence and in overruling his objection to the admission of that evidence, in violation of Hernandez's right to be secure in his house against unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States, because the State obtained the evidence pursuant to an unlawful search and seizure in that (1) police officers searched Hernandez's home without a warrant and without consent in the absence of exigent circumstances and (2) information from that first, warrantless search impermissibly tainted the application for a warrant to search Hernandez's home and seize certain items therein.

Hernandez improperly raises two claims in his point relied on. We do not dismiss, however, because we can readily discern and separate the independent claims. Thus, we gratuitously exercise our discretion to review Hernandez's claims on the merits.

We discern two claims in Hernandez's point relied on. First, Hernandez argues that "the trial court erred in denying [his] motion to suppress" because "the State obtained the evidence pursuant to an unlawful search and seizure in that [] police officers searched Hernandez's home without a warrant and without consent in the absence of exigent circumstances." Second, Hernandez argues "that first, warrantless search impermissibly tainted the application for a warrant to search Hernandez's home and seize certain items therein." Because of these alleged Fourth Amendment violations, Hernandez contends that the court should have excluded "State's Exhibits 3 through 32, all testimony by law enforcement officers about the interior of

Hernandez's residence, and any other physical evidence recovered from inside his home."[5]

Generally, "[t]he Fourth Amendment of the U.S. Constitution preserves the right of the people to be secure from unreasonable searches and seizures." *State v. Lindsay*, 599 S.W.3d 532, 536 (Mo. App. E.D. 2020) (citing *State v. Franklin*, 841 S.W.2d 639, 641 (Mo. banc 1992)). While "[w]arrants are generally required to search a person's home or his person," the warrant requirement is "subject to certain exceptions" because "the ultimate touchstone of the Fourth Amendment is 'reasonableness . . . .'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). A warrant is not required when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (citation omitted). "These exigent circumstance exceptions include pursuing a fleeing felon, preventing the imminent destruction of evidence, preventing a suspect's escape, or mitigating the risk of danger to law enforcement or other persons inside or outside of the dwelling." *Cromer*, 186 S.W.3d at 344; *Shegog*, 521 S.W.3d at 633–34.

---

[5] Hernandez did not submit exhibits 5, 6, 7, and 8 to this Court, so we make our determination based on the submitted trial transcript describing these exhibits on pages 381 and 382. Additionally, because exhibits 31 and 32 are described as photographs of a Ram truck parked outside the residence, these two exhibits would not be subject to suppression. Hernandez lacked a reasonable expectation of privacy in photographs taken from a public vantage point. *New York v. Class*, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"); *State v. Hartrup*, 511 S.W.3d 447, 453 (Mo. App. E.D. 2017) ("[A]nything an individual knowingly exposes to public view . . . involves no reasonable expectation of privacy and is not a subject of Fourth Amendment protection.").

Additionally, Hernandez did not move to suppress "all testimony by law enforcement officers about the interior of Hernandez's residence" in his initial motion but only requested "that the Court suppress all items of evidence recovered on October 6, 2016." Therefore, because Hernandez did not seek this relief from the trial court, we do not consider whether this relief should be granted on appeal.

Missouri courts rely on six main factors relevant to a determination of whether a situation is exigent. *State v. Mahsman*, 157 S.W.3d 245, 249 (Mo. App. E.D. 2004). Those factors are:

> (1) that a grave offense is involved, particularly a violent crime; (2) the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe the suspect committed the offense; (4) strong reason to believe the suspect is in the premises to be entered; (5) a likelihood the suspect will escape if not swiftly apprehended; [and] (6) the entry, though not consented, is made peaceably.

*Cromer*, 186 S.W.3d at 344 (citations omitted).

Two key exceptions to the warrant requirement fit within these factors. First, police may lawfully enter one's home "to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403. "[E]mergency assistance to an injured occupant or to protect an occupant from imminent injury" reasonably permits police entry. *Id.* "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (citation omitted).

Second, police may enter one's home when necessary to prevent a suspect from escaping. *Cromer*, 186 S.W.3d at 344 (citing *Mahsman*, 157 S.W.3d at 249). The U.S. Supreme Court has long recognized that "[p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." *Kentucky v. King*, 563 U.S. 452, 460 (2011); *see Brigham City*, 547 U.S. at 403. Police "may seize evidence in plain view provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *King*, 563 U.S. at 462–63 (citing *Horton v. California*, 496 U.S. 128, 136–140 (1990)). "The Fourth Amendment requires only that the steps preceding the seizure be lawful," permitting

10

police to "view and seize" any evidence in plain view. *King*, 563 U.S. at 463; *Horton*, 496 U.S. at 136–137; *State v. Rutter*, 93 S.W.3d 714, 724 (Mo. banc 2002).

Two Missouri cases closely parallel Hernandez's current appeal and further illustrate how exigent circumstances apply in this case. First, in *State v. Shegog*, police found a deceased victim lying outside between a nearby home and a four-story apartment complex. 521 S.W.3d at 631. Upon interviewing neighbors, police identified Shegog as a suspect and discovered that a woman had been "screaming and yelling with Shegog" outside the apartment prior to the murder. *Id.* at 631–32. Because officers suspected Shegog and had not yet located the woman, officers entered the apartment, "concerned that this woman may still have been in the apartment, either injured or possibly disposing of evidence." *Id.* at 632. Inside Shegog's apartment, police did not find the woman but did find a knife with apparent blood on it. *Id.* Shegog moved to suppress the knife seized during the exigent circumstances search as well as evidence seized pursuant to a search warrant, which the lower court denied. *Id.*

This Court held that "exigent circumstances existed in [Shegog's] case sufficient to justify the initial limited warrantless search of Shegog's apartment." *Id.* at 634. Police needed to "ensure that there was not an additional victim in need of aid or a potential third party who may have been either a perpetrator or possible accessory engaged in the destruction of evidence." *Id.* Thus, "the officers were justified in performing the warrantless search of Shegog's apartment" and "the discovery and seizure of the knife was lawful." *Id.* at 634–35.

Second, in *State v. Wright*, police responded to Wright's apartment after Wright's former girlfriend escaped and reported that Wright abducted, raped, and sodomized her.

11

30 S.W.3d 906, 908–09 (Mo. App. E.D. 2000). The former girlfriend reported that Wright wore rubber gloves and used duct tape to cover her mouth and bind her hands and feet. *Id.* at 908. Believing Wright to be inside the apartment, police entered the unit and, in plain view, saw duct tape, rubber gloves, and a copy of a restraining order between Wright and his former girlfriend. *Id.* at 909. The officers photographed the duct tape, the rubber gloves, and the copy of the restraining order. *Id.* Wright moved to suppress the photographs taken during the officers' warrantless entry into his apartment. *Id.* The court denied the motion. *Id.* at 910.

The Eastern District of this court held that the warrantless entry into Wright's apartment was supported by exigent circumstances and that the officers had reason to believe Wright was in the apartment. *Id.* The court noted that if police left the apartment to obtain a warrant, "there was a likelihood [Wright] would destroy the evidence of the crimes or escape." *Id.* The Court also held that the officers lawfully seized and photographed the items because they were in plain view and connected to the reported crimes. *Id.*

Here, police were justified in entering Hernandez's home based on exigent circumstances. The circumstances surrounding the warrantless search of the residence meet all six factors, making police entry reasonable. First, the offenses were grave. Police suspected Hernandez of causing Victim's potentially fatal injuries by assaulting and shooting her. Second, police could reasonably suspect that Hernandez was armed, as he fired a gun numerous times at Victim, resulting in her gunshot wounds.

Third, police had sufficient probable cause to believe that Hernandez shot

12

Victim. Victim herself told police that "Jose" had shot her,[6] and neighbors pointed police to the residence and identified the house as the location of the gunfire.

Fourth, police had a strong reason to believe that Hernandez was at the home. Neighbors told police that Hernandez lived at the home and one neighbor said she saw Hernandez walking in the home's driveway after the shots were fired.

Fifth, police could reasonably believe there was a strong likelihood that Hernandez would escape, similar to *Wright*. Police could not find Hernandez after they arrived. Police received tips from neighbors that they heard shots fired from the residence and that the neighbors "identified hearing a male voice that they identified as being Jose, a resident of that address." Police knew Hernandez lived in the home, and could reasonably believe that Hernandez fled home after shooting Victim. Hernandez would have reason to flee because he fired several gunshots at Victim, wounded Victim in a publicly visible place, and Victim lay motionless after being shot, pretending to be dead. In fact, Hernandez did flee.

Lastly, while no witness provided testimony at trial as to how the officers entered and the record does not reflect any forcible police entry, officers did testify that they entered the residence with guns drawn.

In addition to these six factors, police also believed the circumstances necessitated entry in case of other injured home occupants. When officers arrived to the scene, they did not know if there were other victims. Police believed other victims could be inside the home, because a neighbor reported hearing arguing inside the home

---

[6] Although Victim may have initially responded "Rick," as heard in Victim's 911 call, Victim struggled to speak and the audio recording is unclear. Even if Victim said "Rick," when Sergeant Lalli repeated "Rick" to Victim, she shook her head to say "no" and said "Jose."

13

around the time of the shooting. Additionally, Hernandez's mother told police that "her husband was still in the house," and the record is unclear whether police believed Hernandez's brother was also in the home. Sergeant Lalli, a responding officer, also testified at the suppression hearing that police initially searched Hernandez's home "[b]ecause we didn't know if there were any other victims and we didn't know if the shooter was inside with anybody else," similar to both *Shegog* and *Wright*.[7] Because officers were justified in entering the residence without a warrant, the officers lawfully discovered the evidence inside the residence—including the blood—that led them to seek a search warrant. Thus, the court did not err in denying Hernandez's motion to suppress.

Police lawfully entered the home and the initial search did not violate the Fourth Amendment. The officers' initial search itself only revealed apparent blood throughout the house, an observation officers lawfully made because the blood was in plain view. All other discoveries occurred after police obtained a warrant to search the residence. Since the initial search was lawful, we need not address Hernandez's second contention that "information from [the] first warrantless search impermissibly tainted the application for a warrant to search Hernandez's home and seize certain items therein."

## Conclusion

The trial court's judgment is affirmed.

_____
Janet Sutton, Judge

Hardwick, P.J. and Chapman, J. concur.

---

[7] Officer Lankard and the State referred to this search for further victims and Hernandez as a "protective sweep," but using this term does not change whether police had sufficient exigent circumstances to lawfully enter Hernandez's home.